STATE of Wisconsin, Plaintiff-Respondent,

v.

Herberto ROMERO, Defendant-Appellant-Petitioner.

Supreme Court

*No. 87–1509–CR. Argued September 8, 1988.—Decided December 16, 1988.*

(Also reported in 432 N.W.2d 899.)

265

For the defendant-appellant-petitioner there were briefs by *Teresa M. Elguezabal* and *LaFollette & Sinykin,* Madison, and oral argument by *Ms. Elgueza-bal.*

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

WILLIAM G. CALLOW, J.    Herberto Romero seeks review of an unpublished decision of the court of appeals which affirmed the judgment of conviction for first-degree sexual assault of the circuit court for Door county, Judge Edwin C. Stephan. The court of appeals' decision also affirmed the circuit court's order denying Romero's motion for a new trial.

There are two issues presented to this court for review. First was it plain error for the circuit court to admit a police officer's testimony concerning allegations of other incidents of sexual assault? Second, was it plain error for the circuit court to admit testimony by the police officer and a social worker that the complainant was truthful in her accusations?

Although the parties have requested that we address these issues under the plain error standard, we find it appropriate, as we discuss later, to analyze them under that portion of sec. 751.06, Stats., which provides for a reversal of a judgment of conviction if the record reveals that the real controversy has not been fully tried, regardless of whether a proper objection appears in the record. We conclude that the admission of testimony concerning other incidents of assault was erroneous but that the error was not

sufficiently egregious to require a reversal of the judgment. We also conclude, however, that the admission of testimony that the complainant was truthful in her accusations and the prosecutor's commentary so clouded the crucial issue of credibility that it may be fairly said that the real controversy was not fully tried. We, therefore, reverse that part of the court of appeals' decision which upheld the admission of the challenged testimony and remand the case for a new trial.

The information in this case alleged that Romero had sexual intercourse with his stepdaughter, E.B., who, at the time, was seven years of age. At trial the key witness for the state was the complainant, E.B. She testified that in October, 1984, Romero had called her into his bedroom to fix his television. She stated that she walked into the room and found that the TV was fine. She claims, however, that as she stood near the bed, Romero removed her clothes and pulled her into bed with him. She stated that he touched her "[w]here I go to the bathroom" with his "[h]ot dog." She also stated that his "hot dog" was inside of her, that he moved around, and that this hurt her. She said that, although she told him to stop, he refused. Afterward she said she felt some "gooshy" stuff where she went to the bathroom. She also testified that she did not report the incident immediately, telling only her four-year-old sister about it.

The state called several other witnesses to support its case. Both E.B.'s mother and Shirley Senarighi (Senarighi), the school guidance counselor, testified that E.B. was an honest child. Senarighi also testified that she had interviewed E.B. about the alleged assault after E.B.'s teacher referred E.B. to her, and she related what E.B. had told her at that time. This

description was consistent with E.B.'s testimony in court.

The next two witnesses for the state testified that they interviewed E.B. after Senarighi reported the case to the Department of Social Services. The substance of their testimony forms the basis for this appeal. Beverly Rice (Rice), a social worker from the Door County Department of Social Services, testified about her talks with E.B. The prosecutor then asked her whether she knew E.B. well enough to form an opinion as to E.B.'s "character for truthfulness or untruthfulness." The defense counsel objected to this question on the ground that Rice did not have an opportunity over a period of time to form such an opinion. The court overruled this objection stating that lack of long-standing opportunity to form an opinion went only to the weight of the testimony. Rice then responded to the question stating that E.B. "was honest with us from the time of the first interview through my subsequent contact with her."

The next witness was Police Officer Dwight Krimbill (Krimbill). He testified that he had experience investigating one hundred or more sexual assaults. The prosecutor then began the following exchange:

"Q. With respect to your experience in your 16½ years, Officer, in investigating sexual assault cases and interviewing people, as part of your professional duties do you have to assess the credibility of either the victim or the perpetrator who is giving statements on these matters?

"A. Yes, sir.

"Q. Going even more broadly than sexual assault cases, in the general realm of criminal investigation, is [it] part of your duties to assess the credibility of both victim and perpetrator and other witnesses to crimes?

"A. Yes, it is.

"Q. Based, then, upon that 16½ years of experience, after your two interviews with [E.B.], were you able to form an opinion as to [E.B.'s] character for truthfulness as far as you were concerned?

"A. Yes, sir. In my opinion, [E.B.] was being totally truthful with us."

The defense counsel did not object to either the questions or the answers in this exchange.

On cross-examination the defense counsel prompted the following exchange when he asked a question about Krimbill's investigation:

"Q. Okay. Did you talk to her two brothers?

"A. Talked to Ben.

"Q. You didn't talk to Jessie?

"A. No.

"Q. How many investigations have you done in sexual assaults?

"A. Approximately a hundred or more.

"Q. Okay.

"A. The reason I only talked to Ben is she had indicated to me that that's who she had called for to come down and help her on one of the other occasions.

269

"MR. BROWN [defense counsel]: Objection, your Honor. I move to strike it as not responsive.

"THE COURT: Well, I don't think we can unring the bell, can we?

"MR. BROWN: Well, I move to strike it, your Honor.

"THE COURT: Well, denied."

After this objection was considered by the court, the cross-examination continued.

"Q. (By Mr. Brown) Now, if you want, let's go back to page two. In your report, does it state that the counselor called [E.B.] into her office and she said that she was touched by her step dad.

"A. Yes, sir. It does.

"Q. Did she ever—did you ever ask her how she knew it was two days before Halloween?

"A. Yes, sir. We, in our conversation with her, she indicated to us that there were four incidents, and she knew the time period because she remembered Halloween being grounded because she had gone trick or treating without permission. And when she got home after trick or treating had been grounded."

Defense counsel did not move to strike this answer.

The state's final witness was Dr. Ferrin Holmes who had examined E.B. approximately a year after the alleged assault. He stated that such a delay by a child in reporting sexual assault is not unusual. Although he found no physical signs of sexual abuse, he noted that such signs would have disappeared within a year. Cross-examination revealed that, dur-

ing his examination of E.B., he was unable to insert either a finger tip or a Q-tip into her vagina because E.B. felt great pain when he attempted to do so. On redirect examination Dr. Holmes stated that it was not impossible for Romero's penis to have caused an intrusion which would constitute penetration under Wisconsin's sexual assault law.

Romero was the first of six witnesses for the defense. He denied committing the assault and claimed to have come back to Wisconsin voluntarily after his arrest in Florida in order to straighten out the situation.

Five defense witnesses testified that Romero had a good reputation for truthfulness. They included the minister who had sponsored Romero when he first arrived as a Cuban refugee, two employers, and the wife and daughter of one of his employers.

In his closing argument the prosecutor discussed E.B.'s testimony and then stated:

> "I think in addition to her own testimony, her direct testimony, as to what it was that happened to her in October of 1984, you heard the testimony of witnesses who were involved in the investigation. And these were not witnesses who have known her from school for a couple hours, or witnesses who see her at a 4-H meeting once a week, or witnesses who know her from the playground.
>
> "These are witnesses who dealt with her with respect to this case, professionals who are trained to investigate this type of case, professionals who had years and years of training and experience in screening out false statements, incorrect statements, mistaken statements.

"And you heard every single one of them testify that based not only on their knowledge of [E.B.] and their contacts with [E.B.], but on all their vast years of experience—the 14½ years of experience that Mrs. Rice has, the 16½ years of experience that Officer Krimbill has, the 10, 12, 13 years of experience that Mrs. Senarighi has. They all believed [E.B.] in the main to be honest, and with respect to this specific criminal case on these specific criminal charges, they believed her to be telling the truth."

Later, again relying upon the testimony of the prosecution witnesses, he stated:

"This is not simply a case of [E.B.'s] word against this defendant, for one to rise and fall, depending on which you want to believe today or which you'll believe tomorrow. You had that testimony from [E.B.], backed up by the testimony of three trained professionals—Officer Krimbill, Mrs. Rice, and Mrs. Senarighi, as to their view of it.

"And again, like [E.B.]—but for different reasons—these are not people who, when they hear the cry of wolf of a sexual assault, that they weigh into the fray without looking, and suddenly we're in court with unfounded, unsubstantiated, and baseless claims.

"These are people who are trained to deal with cases like this.

"We don't get before you, ladies and gentlemen, without cause and without there being in existence an actual crime."

The defense counsel argued that E.B. was lying about the sexual assault. He pointed to Dr. Holmes' testimony, claiming that it was impossible for Romero to have been inside E.B. as she claimed.

The court instructed the jury that it could find Romero guilty of either of two forms of first-degree sexual assault: sexual intercourse with or sexual contact with a person twelve years of age or younger. The jury deliberated and found that Romero was guilty of sexual assault, having had sexual intercourse with E.B., a child of twelve years of age or younger.

In his postconviction motion to the circuit court, Romero moved for a new trial in "the interests of justice" on three grounds: first, the circuit court erred in refusing to strike the testimony referring to other uncharged incidents of sexual assault; second, the circuit court judge refused to recuse himself from the case because of prejudice; third, Romero was denied the effective assistance of counsel. This motion was denied.

Romero then appealed to the court of appeals. In addition to the three claims raised in the postconviction motion, Romero claimed that the circuit court erred in admitting expert testimony that E.B. was truthful in her accusations. The court of appeals held that Romero was not denied the effective assistance of counsel and that there was no showing of prejudice on the part of the trial judge. It also concluded that Rice's testimony was admissible character evidence. It did not address Krimbill's assertion that E.B. was truthful. Finally, the court of appeals held that the admission of Krimbill's references to other incidents was harmless error.

Romero seeks review of the court of appeals' decision. He raises two of the issues addressed below. He contends, first, that it was plain error for the circuit court to admit Krimbill's references to other incidents of sexual assault. He further contends that it was plain error for the circuit court to admit the

testimony of Krimbill and Rice that E.B. was truthful in her accusations.

In order to preserve an issue for appeal as a matter of right, a party must object to the error at trial, stating the proper ground for the objection. *Frankovis v. State,* 94 Wis. 2d 141, 152, 287 N.W.2d 791 (1980). Twice on cross-examination Krimbill referred to allegations of other incidents of sexual assault. The first time defense counsel objected, claiming that the answer was not responsive. He asked that the court strike it. The court refused, stating "[w]ell, I don't think we can unring the bell, can we?" Defense counsel failed to preserve this objection for appeal as a matter of right. Although he moved to strike the first statement as unresponsive, the objection was insufficient to inform the court that the remark was inadmissible evidence of other misconduct; therefore, he failed to preserve it for appeal. Two questions later, when Krimbill again referred to other allegations, defense counsel made no objection and, again, failed to preserve the issue for appeal.

Romero also failed to preserve the right to challenge the testimony relating to E.B.'s credibility. Defense counsel made no objection to Krimbill's statement that E.B. was "totally truthful" with him. Defense counsel objected to the prosecutor's question directed to Rice concerning truthfulness on the ground that Rice had not known E.B. long enough to form an opinion as to E.B.'s reputation for truthfulness. He did not object to Rice's answer that E.B. was honest in her accusations.

Although objections were not properly made at trial, this court may address unpreserved claims by

two means. First, it may address plain error under sec. 901.03(4), Stats.[1] *Virgil v. State,* 84 Wis. 2d 166, 189, 267 N.W.2d 852 (1978). Second, to accomplish the ends of justice it may "reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record." Section 751.06, Stats.;[2] *State v. Penigar,* 139 Wis. 2d 569, 577, 408 N.W.2d 28 (1987). Although the parties' briefs in this case have focused upon the plain error rule, we find it appropriate to apply the standard set forth in sec. 751.06.[3]

---

[1]Section 901.03, Stats., provides in pertinent part:

"(1) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

"(a) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

". . . .

"(4) Plain Error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."

[2]Section 751.06, Stats., provides: "**Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

[3]According to *State v. Sonnenberg,* 117 Wis. 2d 159, 178, 344 N.W.2d 95 (1984), the plain error rule applies when an erroneous

In *Penigar* we held that this court may order a new trial under sec. 751.06, Stats., for two reasons: "(1) the real controversy has not been fully tried; and (2) it is probable that justice has for any reason miscarried." 139 Wis. 2d at 577–78. There are two circumstances under which we have held that the real controversy has not been fully tried: "(1) when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; and (2) when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *State v. Wyss,* 124 Wis. 2d 681, 735, 370 N.W.2d 745 (1985). (Citations omitted.)

Both parties agree that Krimbill's reference to allegations of other incidents involving sexual assault was improper evidence of other acts under sec. 904.04(2), Stats. This error, however, is not such that it requires that we reverse the judgment of conviction. Krimbill's statements were two isolated references made during a two-day trial upon which the prosecutor never commented in his closing argument. They played an insignificant role in the case. Further, the statements did not improperly bolster E.B.'s credibility.

introduction of evidence constitutes a denial of "any fundamental constitutional right or a substantial impairment of the right of fair trial." We conclude that the erroneous admission of evidence in this case is a statutory violation which does not rise to the level of a constitutional violation. Thus, we apply the standard set forth in sec. 751.06, Stats., rather than the plain error standard.

We do find, however, that sec. 751.06, Stats., requires we remand this case for a new trial because of the admission of the testimony by Krimbill and Rice that E.B. was truthful in her accusations. Again, both parties agree that the admission of this testimony was erroneous. The statements were not simply opinions as to E.B.'s character for truthfulness under sec. 906.08(1), Stats. Rather, they were impermissible opinions that E.B.'s accusations were true.

While the prosecutor phrased his questions to ask for admissible character evidence, it is clear from the answers of the witnesses that they were assessing the validity of E.B.'s accusations. Rice said that E.B. "was honest with us from the time of the first interview through my subsequent contact with her." Similarly, Krimbill stated that "[i]n my opinion, [E.B.] was being totally truthful with us." Even more egregious is the use of the statements made by the prosecutor in closing argument. Referring to the witnesses, he stated: "They all believed [E.B.] in the main to be honest, and with respect to this specific criminal case on these specific criminal charges, they believed her to be telling the truth." The state incorrectly claims that this is merely character evidence. This testimony was used to assess E.B.'s credibility and is improper.

This testimony was not admissible under sec. 907.01, Stats.,[4] which states:

---

[4]Although Romero contends that Rice and Krimbill were expert witnesses, we conclude they were lay witnesses. The circuit court was not asked to declare them as experts, nor did he give the jury an expert witness instruction. Therefore, we analyze the admissibility of the testimony under sec. 907.01, Stats., which deals with the testimony of lay witnesses, rather than under sec. 907.02, which governs the testimony of expert witnesses.

"**Opinion testimony by lay witness.** If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

The testimony in this case was not helpful to the jury. Rather, it tended to usurp the jury's role. The credibility of a witness is left to the jury's judgment. *State v. Friedrich,* 135 Wis. 2d 1, 16, 398 N.W.2d 763 (1987). As the court of appeals declared in *State v. Haseltine,* 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984), "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." In *Haseltine* the court of appeals properly concluded that the admission of psychiatric testimony that a complainant in a rape case was telling the truth was prejudicial error. *Id.* Other state courts, likewise, have rejected testimony which interferes with the role of the jury by assessing the credibility of a complaining witness. *See, e.g., State v. Middleton,* 294 Or. 427, 438, 657 P.2d 1215 (1983); *State v. Kim,* 318 N.C. 614, 621, 350 S.E.2d 347 (1986).

We conclude that the erroneous admission of this testimony requires that we grant a new trial pursuant to sec. 751.06, Stats. Unlike the references to allegations of other incidents, the testimony discussing the truthfulness of E.B.'s accusations played a significant and perhaps decisive role in this case.

Discussion of the truthfulness of E.B.'s accusations was not an isolated incident at trial. The prosecutor elicited testimony that Rice and Krimbill had experience in assessing credibility before they

pronounced their determination of truthfulness in this case. Further, the prosecutor relied heavily upon the testimony in his closing argument. He repeatedly emphasized the witnesses' training and experience in assessing credibility. He insisted that:

> "This is not simply a case of [E.B.'s] word against this defendant, for one to rise and fall, depending on which you want to believe today or which you'll believe tomorrow. You had that testimony from [E.B.], backed up by the testimony of three trained professionals—Officer Krimbill, Mrs. Rice, and Mrs. Senarighi, as to their view of it."

The sole issue in this case is whether the complainant or the defendant was telling the truth. There was no evidence of guilt in this case beyond E.B.'s testimony. The other state witnesses merely testified about what E.B. had told them. It was simply E.B.'s word against Romero's, a one-on-one battle of credibility.

This credibility issue was clouded by the admission of the testimony of Rice and Krimbill. Their testimony, and the prosecutor's use of it, pervaded the entire trial. There is a significant possibility that the jurors, when faced with the determination of credibility, simply deferred to witnesses with experience in evaluating the truthfulness of victims of crime. Therefore, it may be fair to say that the real controversy was not fully tried. We find in this case, as we found in a similar case, *Lorenz v. Wolff,* 45 Wis. 2d 407, 426, 173 N.W.2d 129 (1970), that the "circumstances of this trial prevented a fair trial of the factual issues of this case."

We, therefore, reverse and remand for a new trial pursuant to sec. 751.06, Stats.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for a new trial.

DAY, J. (dissenting). I dissent. I would uphold the conviction of the defendant, Herberto Romero, for the crime of having sexual intercourse with the seven year old victim. Thus, I would affirm the court of appeals and the circuit court.

The majority opinion reverses the conviction and gives the defendant a new trial.

I dissent for two reasons.

I.

*HARMLESS ERROR*

Any error in letting the unobjected to answers of two of the state's witnesses stand to the effect they believed what the child victim told them is harmless in view of the entire record in this trial.

(a)   Section 901.03(1)(a), Stats.,[1] requires an objection to be made or it is waived. Defendant did not object because of trial strategy. He should not now be heard to complain.

[1] "**901.03 Rulings on evidence (1)** Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

"(a)  *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; . . ."

(b)   The majority states the general rule that a witness should not be allowed to testify as to their belief that another witness is telling the truth. Here, the district attorney asked proper questions of each witness: "Do you have an opinion as to E.'s character for truthfulness?"

The response was they believed what she told them. This response was not objected to and is so close to what would have been the correct response, i.e., "Yes, I have an opinion and in my opinion her character for truthfulness is she has a truthful character" (or words of similar import).

Their contact with her was limited to their conversation with the victim about the assault. So what else could they have based an answer on but those conversations? The answer is, nothing. So I believe the difference between, "I believe she has a truthful character" and "I believe what that she told me" is really the very same thing under the facts here present and the jury understood it as a positive response to the question: "Do you have an opinion as to her character for truthfulness?"

I believe that whatever slight semantic difference in wording as to the witnesses' evaluation coming as it must from the conversations they had with her is so slight as to be harmless.

(c)   The issue of the truthfulness of the child victim and the defendant, both of whom testified, was "fully tried." The testimony of the child and the examining physician made it overwhelmingly clear that it was the victim who was telling the truth.

(d)   There is a strong policy to *not* subject sexual assault victims to relive their ordeal in a second trial when the evidence of the defendant's guilt is weighed

against the claimed error. This is especially true where the victims are as young as the one in this case.

An examination of the record shows that the claimed error is harmless.

The majority theory is that "the record reveals that the real controversy has not been fully tried, regardless of whether proper objection has been made in the record."

The majority opinion is wrong. The issue was fully tried by both sides as the record clearly demonstrates.

Both the little girl victim, and the defendant testified under both direct and cross-examination.

The reason defense counsel did not object to either the very correct and proper questions that the district attorney asked the state's witnesses or object to their answers was a matter of trial strategy. The defendant wanted to and did ask the same type of questions of his five "character for truthfulness" witnesses. He went even further. Not only did he get them to say they believed the defendant was a truthful person, he also got two of them to say they believed the testimony they heard in court by the defendant, wherein he denied committing the assault!

The majority opinion is dead wrong in its statement at page 271: "[F]ive witnesses testified that Romero had a good reputation for truthfulness." Not one of the five witnesses testified about the defendant's reputation at all. Each one testified they believed, based on whatever their limited or extensive contacts were with the defendant, that he was truthful.

I agree with the majority that the "plain error" standard of review is not appropriate in this case. I further conclude that the portion of sec. 751.06, Stats.,

"that the real controversy has not been fully tried" theory is also inappropriate.

The majority has fallen into the trap of permitting defense counsel's deliberate plan to try and refute the little girl's testimony with the defendant's sworn denial and a parade of witnesses saying that he's truthful, to justify giving the defendant a second trial.

Section 906.08(1), Stats.,[2] provides in part that "the credibility of a witness may be ... supported by evidence in the form of reputation *or opinion,* but subject to these limitations: (a) the evidence may refer only to character for truthfulness or untruthfulness ...."[3]

---

[2]Section "**906.08. Evidence of character and conduct of witness. (1) Opinion and Reputation Evidence of Character.** Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to these limitations: (a) the evidence may refer only to character for truthfulness or untruthfulness, and (b), except with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion of reputation evidence or otherwise."

[3]"That actual character is distinct from reputation of it, and the later is merely evidence to prove the former, ought to be a truism." 5 J. Wigmore, *Evidence,* sec. 1608 (Chadbourne rev. 1974). Character is what someone actually is; reputation is what others perceive that person to be. Moreover, reputation is only one of three kinds of evidence used to try to ascertain one's character. The other two being personal knowledge or opinion evidence, and particular instances of conduct which may infer a type of character. 3A *Id.* at sec. 921. These three types of evidence are included in our statute, sec. 906.08, Stats.

The Rules of Evidence for the State of Wisconsin have been modeled after the Rules of Evidence for United States courts and magistrates. Hallows, *Foreward* to *Wisconsin Rules of Evidence,* 59 Wis. 2d Riv (1974). Section 906.08, Stats., is based on the Federal

The first witness called by the state was the child victim's mother. On direct examination she was asked:

> "Q. Based upon all those things that you've had, I guess basically the contacts a mother would have with her daughter, do you have an opinion as to your daughter, [E.'s], character for truthfulness or untruthfulness at this time?

> "A. I think she's basically a very honest—you know, an honest child ...."

The child victim was the next witness and she was extensively cross-examined and her story remained constant and consistent with what she had told the school guidance counselor, a social worker, a police officer and what she had testified to at the defendant's preliminary hearing.

The state next called Shirley Senarighi, the school guidance counselor since 1979, who had known the victim for four years. She was asked:

> "Q. Now, based, then, on these interviews you had with [E.], and I think in addition you've indicated you had contacts with her since kindergarten on at least a weekly basis, do you feel that, based on those contacts with her, you would have an opinion as to [E.'s] character for truthfulness or untruthfulness."

At this point defense counsel objected:

> "MR. BROWN: Well, your Honor, I'm going to object. No foundation laid for it."

Rule 608. Although sec. 906.08(1), Stats., differs slightly in exact wording with the current federal rule, our statute is almost exactly the same as the 1971 draft of the federal rule. *See* 3 J. Weinstein and M. Berger, *Weinstein's Evidence,* sec. 608[02] (1988).

The court asked the district attorney to repeat the question which he did, as follows:

"Q. I'll restate it, and hopefully I'll get it the same. Based upon the contacts you had with [E.], not only in these interviews but also with respect to the way you described your contacts with her earlier, being on at least a weekly basis, going back to her being in kindergarten, do you have an opinion as to [E.'s] character for truthfulness or untruthfulness?"

The defense counsel said "same objection." The objection was overruled and the witness said she did have an opinion. The district attorney asked:

"Q. And what is that opinion?

"A. I find [E.] to be real honest and forthright and real open. I feel she's honest."

The defense counsel did not object to the answer and is not objecting to this review to the answer given.

The next witness was Beverly Rice, a social worker of fourteen years experience who had investigated "hundreds" of cases of child sexual abuse according to her testimony. After testifying to her contacts with the victim she was asked by the district attorney:

"Q. Based on your years of experience and your training, Mrs. Rice, do you feel that you have met and gotten to know [E.] well enough to form an opinion as to her character for truthfulness or untruthfulness?

"A. Yes."

Defense counsel objected:

"MR. BROWN: Your Honor, I'm going to object to the form of the question. I don't believe a proper foundation has been made. He's asking a question about an incident where she's only been involved with an incident of questioning about sexual assault. She has no background to give any opinion as to her reputation for honesty over a period of time or anything else ...."

The circuit court overruled the objection saying:

"THE COURT: Oh, the objection is overruled. Lack of long-standing opportunity may go to the weight of the testimony. It's a matter for the jury to decide. She may answer."

The questioning proceeded:

"Q. [By Mr. Pelrine] Did you say you had an opinion?

"A. Yes.

"Q. What is that opinion?

"A. I believe that [E.] was honest with us from the time of the first interview through my subsequent contact with her."

It should be noted that the defense counsel's only objection was that the witness had not had enough contact with the victim to evaluate her character. Defense counsel did not object to the answer or move to strike it. Why? Because as the record shows, he wanted to be free to ask the same type of questions of the defense witnesses he planned to call. They all had longer contact with the Defendant and he counted on their testimony being more effective with the jury. This was a case of simple trial strategy. This court should not now hear the defendant complain because his trial strategy did not result in a favorable verdict.

The next witness for the state was Officer Dwight Krimbill of the Sturgeon Bay Police Department. He had served on the force sixteen and one-half years. He had investigated one hundred or more cases of abuse. He was asked on direct examination:

"Q. Based, then, upon that 16½ years of experience, after your two interviews with [E.], were you able to form an opinion as to [E.'s] character for truthfulness as far as you were concerned?

"A. Yes, sir. In my opinion, [E.] was being totally truthful with us."

The state's last witness was Doctor Ferrin C. Holmes. He was not asked about character for truthfulness of the victim. His testimony as to his physical examination of her will be referred to later.

The defense opened its case with the testimony of the defendant. He denied all allegations of any sexual contact with the child victim at any time or in any manner. It was a case of "his word against hers."

This is when the trial strategy of the defense counsel became obvious.

The first witness called after the defendant was the Reverend Richard DeBendetto who had known the defendant since 1980. The following questions and answers were given:

"Q. Now, sir, over the period of time that you have known Herberto, have you any opinion, sir, as to Herberto's reputation in the community as to truthfulness?

"A. I can speak—I can speak in terms of Herberto's relationship with me, that he's always been very honest and forthright, and as over against myself and the other sponsors, has always shown a great deal of integrity.

"Q.  Now, Reverend, I asked you to come to court, and I believe you sat through most all, if not all, of the testimony here; is that correct?

"A.  A good share, yes.

"Q.  You heard Herberto testify this morning?

"A.  Yes, I did.

"Q.  Was your opinion as to his truthfulness, forthrightness, the same after you heard him speak today?

"A.  Yes, it is."

It should be noted that while the question did use the words "reputation in the community as to truthfulness" that was not answered. Instead, the witness replied, "I can speak ... of Herberto's relationship with me ...."

This witness even went so far as to testify that he believed what the defendant testified to that day in court. None of the state's witnesses went that far. They only stated they thought the child victim had been truthful with them when they interviewed her.

The next witness for the defense was Roger Espe who had known the defendant since 1980. The defendant had worked for Mr. Espe and was living at the Espe home at the time of trial. The defense lawyer asked:

"Q.  Do you have an opinion, knowing him as long as you have—he worked for you—as to his character for truthfulness?

"A.  Herberto has always been very honest with me. Very honest.

"Q.  Is your opinion, then, that he is truthful?

"A.  Yes. Definitely.

"Q. Now, Roger, you've sat here during this whole trial. Is that correct?

"A. That's right.

"Q. You heard Herberto testify. Is that correct?

"A. Yes.

"Q. Does your opinion—has your opinion changed as to your opinion as to his truthfulness?

"A. No."

The next defense witness was Stephen Wood. He was asked:

"Q. And you've heard the questions that I asked the Reverend DeBendetto and also Roger; is that correct?

"A. That's correct.

"Q. Do you have an opinion, sir, in knowing him and having him work for you, as to his characteristic as to truthfulness?

"A. My opinion of Herberto, is, as far as working with him, that he was a good worker. We valued his work. When he left for other jobs or other places, we always hired him back. As a work person, we have a high opinion of Herberto.

"Q. How about his characteristic as to truthfulness, sir?

"A. As far as I know, as far as working, he has been honest with us.

"Q. And truthful?

"A. And truthful."

The next witness was Mrs. Sandy Espe, wife of Roger Espe. She testified:

"Q. Now, over the period of time that you have known Herberto, do you have an opinion as to his characteristic as to truthfulness?

"A. I have no reason to believe that he's not truthful. Herberto has been a good person, a kind person."

The defense then called Jill Espe the sixteen year old daughter of Roger and Sandy Espe. Jill Espe testified in part as follows:

"Q. Okay. Now, that period of time, have you an opinion as to Herberto's characteristics for truthfulness?

"A. I'd trust him.

"Q. You have—as to truthfulness—do you believe him when he tells you anything?

"A. Yes.

"Q. So, as to truthfulness, you believe he has the characteristics of telling the truth. Is that correct?

"A. Yes.

"MR. BROWN: No further questions."

Following this witness the defense rested its case.

Both the state and the defense phrased their questions in a similar manner. The defense counsel clearly wanted and expected his witnesses to say they knew Romero and believed him to be truthful and two went so far as to put their imprimatur on his trial testimony.

There was no failure to try the "real issue." The little girl testified and the witnesses who had interviewed her were asked to give their "opinion as to her character for truthfulness." When the defense objected that some hadn't known her long enough, the trial

judge properly said that goes to weight, not admissibility. They then gave their opinion based on their experience with her.

What was unfair about that? The jury had heard her and heard the witnesses and the jury knew those witnesses were merely giving their opinion as to her character for truthfulness from their contacts with her.

The defense knew that too and obviously wanted to elicit the same type of testimony from witnesses who knew the defendant a longer time and liked him and believed him.

There was no miscarriage of justice here. Each side did virtually the same thing and the jury knew that and gave it such consideration as they felt it warranted.

But it wasn't the testimony of the character witnesses that bore more heavily in favor of the prosecution. It was the testimony of the victim of this assault. Her account of what occurred had been told over and over to a social worker, a guidance counselor and a police officer. It had been told at the preliminary hearing and again at trial. It wasn't glib or memorized, it was difficult. She had difficulty testifying before the jury of twelve strangers. In fact, she encountered such difficulty that the defense counsel wanted to make sure the record showed it. When the victim was told she could leave the stand to return after the lunch break, Mr. Brown, the defense counsel said:

> "THE COURT: You have something you want to put on the record, Mr. Brown?
>
> "MR. BROWN: Yes, your Honor. I believe it's only appropriate on behalf of my client that I put

on the record that I believe it was approximately 20 minutes of 12:00 when the examination of [E.] started. It is now one minute of 12:00, and it's obvious that—of course the record will not reflect, unless I say something about it, but in the last series of questions, there has been a great deal of hesitancy and no answers given by the witness to the questions put forth to her by the district attorney. And without any response at all, the district attorney has had to go into other questions to try and elicit some answer from her."

Mr. Pelrine, the district attorney, then said:

"Your Honor, I'll so stipulate. But I'll further point out, being approximately two to three feet away from the witness at the time of the testimony, that during that same period of time she was also noticeably trembling and tears were forming in her eyes."

I believe there is no error in this record that warrants putting this victim through another trial.

The United States Supreme Court in overruling a court of appeals' decision to grant a new trial in a rape case said:

"[I]n the administration of criminal justice, courts may not ignore the concerns of victims. Apart from all other factors, such a course would hardly encourage victims to report violations to the proper authorities; this is especially so when the crime is one calling for public testimony about a humiliating and degrading experience such as was involved here. Precisely what weight should be given to the ordeal of reliving such an experience for the third time need not be decided now; but that factor is not to be ignored by the courts." *Morris v. Slappy,* 461 U.S. 14–15 (1983).

Probably the testimony that was most damaging to the defense came from the doctor. The defense stressed that there was no physical evidence that the defendant had penetrated the child's body. The testimony of Doctor Holmes on re-cross-examination explained the child's perception of what happened to her. The questioner is Mr. Brown, defense counsel:

> "Q. Let us assume that the testimony here in this courtroom, and assume further the facts contained in the police report, the question is asked of [E.] where she states in the report and stated to the guidance counselor, Bev Rice, the police officer, that his hot dog was inside where she goes to the bathroom; assume further that in the police report the question was asked of her, 'Was his hot dog up against you or inside you?' and the answer was, 'No, it was inside me.' Do you have an opinion based further on the fact that his body—Herberto Romero's body—was moving up and down, that that—inside of her—indicating penetration?

> "A. Given the way she reacted to the way—I never asked her these questions myself—but given the way she reacted to when I tried to insert even a Q-tip into the area in question, I would expect her, I think, to say that she thought it was inside of her. I think she would have thought I stuck that Q-tip up inside of her, the way she reacted. I didn't. I only penetrated a little bit.

> "Q. But based upon her statement to these people, three different people, and what you have read in that police report, did that indicate that she said it was inside of her?

> "A. I was told that. I read it in the report, that she said it was inside of her. I think that she would interpret what happened to her with a degree of

293

pain, that I felt that something being stuck inside of her.

"Q. And there was no—

"A. There was no other experience to go by.

"Q. And there was no evidence of any penetration. Is that correct?

"A. That's correct.

"MR. BROWN: No further questions."

This again demonstrated the reasonableness of this little girl's testimony and her reaction to her ordeal.

Let us now turn to the final argument of both counsel.

The district attorney's final arguments runs from page 336 to page 349 of the transcript, a total of 318 lines. After giving the background and experience of the persons who had questioned E., only ten lines were devoted to the state's witnesses comments about believing the victim's account of the events that took place in the bedroom.

At page 341 of the transcript, the district attorney argued:

"And you heard every single one of them testify that based not only on their knowledge of [E.] and their contacts with [E.], but on all their vast years of experience—the 14½ years of experience that Mrs. Rice has, the 16½ years of experience that Officer Krimbill has, the 10, 12, 13 years of experience that Mrs. Senarighi has. They all believed [E.] in the main to be honest, and with respect to this specific criminal case on these specific criminal charges, they believed her to be telling the truth."

That is ten lines out of 318 lines of closing arguments by the district attorney or three percent! That is really something less than usurping the function of the jury.

On rebuttal, the district attorney made no reference to any of the testimony of those who had questioned the victim. The district attorney had said early in his final argument at page 338:

> "Now, we're dealing here, I think, with a number of witnesses on behalf of the State. But as I tried to point out in opening statements, there is really only one witness that counts in this case, and that's [E.]."

The defense final argument runs from page 349 to 360 with a total of 275 lines.

The defense counsel characterizes the little girl's testimony as a "damned lie." The jury obviously didn't agree with him.

The defense counsel argued:

> "My people who came to testify about Herberto's truthfulness, two of them were here during the whole trial. And I asked them, after listening to the testimony of everyone, do you still have the opinion, same opinion, as to the truthfulness of Herberto Romero?
>
> "Yes."

So both the district attorney and the defense each referred to the testimony of "character for truthfulness" witnesses. It's hardly worth putting everyone through another trial!

The "real issue" was thoroughly tried on both sides. I do not believe that the jury's function usurped. There is no "miscarriage of justice" in this case. The

jury heard the evidence and realized it was not the little girl who was lying, it was Romero.

I would affirm the trial court and the court of appeals.

## II.

### OPINION TESTIMONY AS TO TRUTHFULNESS OF PARTICULAR STATEMENTS SHOULD BE ADMITTED

I believe that qualified witnesses should be allowed to testify as to their opinion as to the truthfulness or untruthfulness of narrations of sexual assault given by child victims to them in the course of their investigation. In the case such as the one before us, I would allow testimony by witnesses of a similar background and experience to those who testified here as to their perception of the truthfulness of a child's statement given to them under circumstances similar to those that occurred here. Such witnesses I would regard as "qualified" to offer such testimony. It would be subject to cross-examination. The jury should also be instructed that the determination of truthfulness or untruthfulness is up to them. Opinion is never fact—it is merely opinion.

All of us know the problem that child sexual abuse has become in our society. I believe allowing qualified witnesses to give their opinion can be of help to a jury in evaluating the testimony of small children.

Professor Weinstein has stated that:

"Expert witnesses—i.e., psychiatrists and psychologists—may now be called to express their opinion of the witness' veracity, thereby raising much the

same problems that ensue when these experts testify about a witness' mental capacity ...." 3 J. Weinstein and M. Berger, *Weinstein's Evidence,* sec. 608.04 (1988).

I would allow such experts in the case of children of tender years and would also allow such testimony by other qualified witnesses.

For the reasons given in either Sections I or II of this dissent, I would affirm the conviction.

I am authorized to state that Justices DONALD W. STEINMETZ and LOUIS J. CECI join in this dissenting opinion.