ANN WALSH BRADLEY, J.
¶ 71. {dissenting).
The State of Wisconsin seeks review of an unpublished per curium decision of the court of appeals that reversed the conviction of Stanley Maday, granting him a new trial. The court of appeals determined that the State violated what heretofore has been a rule in Wisconsin held sacrosanct—under no circumstances may an expert witness opine on whether another witness is being truthful.
f 72. At issue is whether a social worker's expert testimony at trial impermissibly vouched for the credibility of a child witness. Until today, the fundamental premise that the jury is "the lie detector in the courtroom" has properly limited the admissibility of expert testimony regarding a witness's credibility. State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (1984) (citing United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973)).
*204 f 73. However, in this case the majority concludes otherwise. It determines that Haseltine permits a social worker's expert testimony that she saw no indication that the witness was dishonest during her interview. Additionally it puts its imprimatur on testimony that she saw no indication that the witness had been coached to make false allegations. Majority op., ¶ 3.
¶ 74. In reaching its conclusion, the majority misconstrues Wisconsin precedent, distorting and expanding the limited exceptions allowing for expert testimony until they swallow the rule. As a result, it allows social science to usurp the jury's role as the lie detector in the courtroom. The majority further errs in reconfiguring the expert's testimony by creating out of whole cloth the necessary foundational facts, which even the State concedes are nonexistent in this record.
¶ 75. Contrary to the majority, I conclude that the social worker's expert testimony that she saw no indications of dishonesty crossed the line drawn by Haseltine. It impermissibly vouched for the credibility of the child witness.
¶ 76. Similarly, I determine that the testimony addressing indications of coaching was impermissible. Although our precedent establishes that coaching testimony may fall within a Haseltine exception if the proper factual foundation is established, no such foundation exists in this record.
¶ 77. Because I further conclude that Maday's trial counsel was ineffective by failing to object to this vouching testimony, I would affirm the court of appeals. Accordingly, I respectfully dissent.
I
¶ 78. From the outset, the majority misconstrues well-established Wisconsin precedent, distorting and *205 expanding the limited exceptions allowing for expert testimony until they swallow the rule.
¶ 79. Thus, I begin as the majority should have, with Haseltine's rule that "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." Haseltine, 120 Wis. 2d at 96.
¶ 80. Because the majority opinion substantially alters the limited exceptions permitting expert testimony, I pause to set those forth here. Haseltine determined that in only limited circumstances will expert testimony aid a jury. Id. at 96-97. For example, the Haseltine court explained that an incest victim may exhibit behaviors, such as not immediately reporting the incest or recanting allegations, which might lead jurors to believe that the victim is not telling the truth. Id. at 97. It reasoned that an expert "could explain that such behavior is common among incest victims as a result of guilt, confusion, and a reluctance to accuse a parent." Id. at 97.
¶ 81. In State v. Jensen, 147 Wis. 2d 240, 244, 432 N.W.2d 913 (1998), this court permitted a guidance counselor to testify regarding specific changes in the victim's behavior at school, such as acting out in class and noncompliance with homework. After addressing the specific behaviors exhibited by children who had been sexually abused, the guidance counselor testified that the victim's behavior was consistent with the behavior of child sexual abuse victims. Id. at 246-48.
¶ 82. The Jensen court concluded that the counselor's testimony was permissible because "the expert witness's knowledge and experience might have assisted the jury in this case." Id. at 246. It determined that "the reactions and behavior of sexually abused children are not ordinarily matters of common knowl *206 edge and experience and that the jury might therefore be aided by the witness's specialized knowledge in this area." Id.
¶ 83. Thus, Jensen explained that "an expert opinion is useful for disabusing the jury of common misconceptions about the behavior of sexual assault victims." Id. at 251. Jensen was explicit, however, that "the expert witness must not be allowed to convey to the jury his or her own beliefs as to the veracity of the complainant with respect to the assault." Id. at 256-57.
¶ 84. More recently, in State v. Krueger, the court of appeals permitted "expert testimony on typical signs of whether a child has been coached or evidences suggestibility and whether the complainant child exhibits such signs." 2008 WI App 162, ¶ 14, 314 Wis. 2d 605, 762 N.W.2d 114. The Krueger court observed that testimony about a child's consistency, coupled with testimony regarding the behavior of like-aged children, could help the jury understand the interview and rebut a defense theory of coaching or suggestion. Id., f 15. Thus, Krueger explained that "[s]igns of coaching or suggestion could fall into the realm of knowledge that is outside that of a lay-person jury." Id.
¶ 85. The Krueger court provided specific guidance regarding the bounds of permissible testimony. Appropriate testimony addresses "objective signs or behavior indicative of whether the child's rendition is of the child's own making—whether truthful or not." Id., ¶ 15 n.10. Krueger further detailed that in addition to patterns of consistency, examples of objective behaviors include the child's ability to supply peripheral details of the alleged incident, the use of language *207 that reflects the word usage of an adult, or the reporting of information not appropriate for the developmental level of the child. Id.
¶ 86. The majority misconstrues Wisconsin precedent by ignoring that Krueger, and not Jensen, addressed the type of coaching testimony at issue in this case. Krueger makes clear that an expert must testify to objective signs or behaviors of coaching before offering an opinion as to whether a child witness exhibited those signs or behaviors. Id. Yet, this requirement is absent from the majority opinion, which contends that under Jensen an expert's qualifications provide sufficient foundation for her testimony.
¶ 87. Discussing Jensen, the majority asserts that it simply "requires [the social worker] to provide sufficient detail about what she is trained to look for,. . . and [she] did so." Majority op., ¶ 47 (citing Jensen, 147 Wis. 2d at 255). In its analysis, the majority quotes at length from the expert's testimony regarding her training and experience in conducting this type of interview. Majority op., ¶¶ 44-46. Thus, the majority concludes that the social worker "provide[d] a sufficient contextual basis to testify about the indications she observed or, more to the point, did not observe during the course of her cognitive graphic interview with K.L." Majority op., f 47.
¶ 88. The majority distorts the Jensen exception because Jensen does not require that an expert testify only about the methods she uses in interviewing a child witness or her training in using these methods before offering a conclusion. A social worker's interview methods, as well as training in using these methods, certainly pertain to her qualifications as an expert. However, whether the social worker was prop *208 erly qualified as an expert witness is not at issue here.[1] What is in dispute is whether the expert's testimony *209 impermissibly vouched for the credibility of the child witness.
¶ 89. Haseltine, Jensen and Krueger, do not allow a social worker to offer an opinion as to whether a witness showed signs of dishonesty. Instead, our precedent permits an expert to testify about the behaviors of victims of abuse and the objective signs or behaviors of coaching. An expert may offer an opinion regarding whether a witness showed signs of coaching only after providing a foundation by testifying about the objective signs or behaviors of coaching and whether a witness exhibited those signs. Krueger, 314 Wis. 2d 605, ¶ 15 n.10.
¶ 90. Under the majority's expansion of the law, every qualified expert could offer a conclusion regarding whether a witness showed signs of dishonesty or coaching provided that she was properly qualified as a witness. The Haseltine rule, which the majority purports to follow, would be swallowed by the exceptions.
hH I—I
¶ 91. I turn next to address whether the testimony in this case is permissible under the Haseltine rule or one of the limited exceptions set forth in Haseltine, Jensen and Krueger. The expert testified that during the interview there was no indication that *210 the witness was dishonest. Additionally, without any foundational testimony regarding the objective signs or behaviors of coaching, the expert confirmed that there was no "indication that [the witness] had been coached in any way during her interview." I address each in turn.
A
¶ 92. In determining the expert could testify that she saw no indication of dishonesty, the majority violates the essential Haseltine rule and allows purported social science to usurp the jury's role as the lie detector in the courtroom.
¶ 93. The majority acknowledges that when "[v]iewed in isolation, a question about indications of whether a witness was 'being honest' would seem to go more directly to truthfulness than a question about indications of coaching." Majority op., ¶ 49. However, the majority excuses this testimony by reasoning that "[h]ere, though, we are not viewing Gainey's testimony in insolation, but rather, we view it in the context of a cognitive graphic interview." Id.
¶ 94. It reasons that "[a]ny concerns we may have that Gainey was commenting on K.L.'s veracity were addressed during Gainey's testimony in that Gainey was clear that a 'cognitive graphic interview' technique helps only to increase the reliability of allegations from children." Id., ¶ 50. According to the majority, "[t]he forensic interview techniques used today are accepted among experts and courts as effective tools for investigating child sexual assault allegations because these methods minimize the risk of false allegations of abuse that result from a child's vulnerability to suggestion and coaching." Id., f 28.
*211 ¶ 95. There is no basis for the flexibility the majority finds in the law. Wisconsin precedent is clear and unambiguous that "[u]nder no circumstances may the expert venture an opinion about whether the subject is being truthful or whether the crime occurred." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 608.3, at 489-90 (3rd ed. 2008); see also Haseltine, 120 Wis. 2d at 96; Jensen, 147 Wis. 2d at 256-57; Krueger, 314 Wis. 2d 605, ¶ 19; State v. Romero, 147 Wis. 2d 264, 278, 432 N.W.2d 899 (1988).
¶ 96. The law does not place as much faith in interview techniques as does the majority. Social science, as the majority acknowledges, may be deemed reliable today and unreliable in the future. See majority op., ¶ 27.
¶ 97. Indeed, experts and commentators agree that "the fields of [mind sciences] have not developed to a point where these practitioners are likely to be better judges of truthfulness than a lay jury." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 608.3, at 485. Consequently, the law of evidence "remains justifiably skeptical of the role of the various mind sciences in assessing credibility, as best seen in the blanket exclusion of polygraph evidence." Id. at 485-86.
f 98. This court has recognized that a psychiatrist has "no specialized ability to assess the truthfulness of [a witness's] account." State v. Kleser, 2010 WI 88, ¶ 105, 328 Wis. 2d 42, 786 N.W.2d 144 (citing State v. Moran, 728 P.2d 248, 255 (Ariz. 1986) (citing People v. Bledsoe, 681 P.2d 291, 300 (Cal. 1984) ("Psychologists and psychiatrists are not, and do not claim to be, experts at discerning the truth. Psychiatrists are trained to accept facts provided by their patients, not *212 to act as judges of patients' credibility.")). As Haseltine cautioned, an expert's opinion on truthfulness provides only an' "aura of scientific reliability," which must not replace the jury as the lie detector in the courtroom. See 120 Wis. 2d at 95.
¶ 99. Accordingly, it the proper role of the jury, and not an expert witness, to determine whether a witness is truthful. Id. at 96. The jury in this case had the opportunity to watch the child witness's videotaped testimony and observe her testimony at trial. By concluding that the context of a "cognitive graphic interview" permits an expert to testify about a witness's truthfulness, the majority allows social science to usurp the jury's role as lie detector in the courtroom.
f 100. The majority repeatedly contends, however, that because the expert did not use the word "opinion," and instead said that she saw no "indications" of dishonesty, her testimony will aid the jury. It errs because as this court has explained, the vouching rule does not become "inapplicable simply because a witness does not use specific words such as 'I believe X is telling the truth'..." KLeser, 328 Wis. 2d 42, ¶ 102. Indeed, "[tjhere is no requirement that an expert explicitly testify that she believes a person is telling the truth for an expert's opinion to constitute improper vouching testimony." Id.
¶ 101. A "requirement that specific words be used would permit the rule to be circumvented easily." Id. That is exactly what the majority allows the State to do here, when it determines that the expert's testimony that she saw no indications of dishonesty is admissible.
¶ 102. Contrary to the majority's assertions, this testimony is not admissible even if it addresses a witness's truthfulness only in the context of a cognitive *213 graphic interview. Haseltine prohibits expert testimony regarding a witness's credibility and therefore prohibits the expert's testimony about whether the witness was being honest during her interview. 120 Wis. 2d at 96. A unanimous court of appeals determined that this testimony clearly crossed the Haseltine line. I agree.
B
¶ 103. Next I address whether the expert's testimony that she saw no indications that the witness had been coached is permissible under one of the limited exceptions set forth in Haseltine, Jensen scad Krueger. I begin by invoking and paraphrasing the maxim: the majority may be entitled to develop its own opinion, but it is not entitled to develop its own facts. Out of whole cloth, the majority develops its own factual record, which even the State concedes is nonexistent.
¶ 104. Haseltine and Jensen permit expert testimony about the typical behavior of victims of abuse. Haseltine, 120 Wis. 2d at 97; Jensen, 147 Wis. 2d at 246. The expert's testimony in this case did not address the typical behavior of victims of abuse, such as a delay in reporting or acting out in school. Consequently, I need not further address this limited exception. Instead, the testimony here focused on the interview process. Thus, I examine the limited exception for coaching testimony derived from an interview and permitted under Krueger.
¶ 105. Krueger reasoned that testimony about whether a child's behavior during an interview is consistent with the behavior of like-aged children could both help a jury understand the interview and rebut a defense theory of coaching. 314 Wis. 2d 605, *214 f 14. Under Krueger, admissible testimony addresses "objective signs or behavior" such as a child's ability to supply peripheral details of the alleged incident, the use of language that reflects the word usage of an adult, or the reporting of information not appropriate for the developmental level of the child. Id., f 15 n.10.
f 106. The expert in this case gave none of the foundational testimony that Krueger requires. Without any foundational testimony regarding the objective signs or behaviors of coaching, the expert witness baldly concluded that there was no indication that the witness had been coached in any way during her interview.
¶ 107. To fill a void in the record, the majority reconfigures the expert's testimony here. It asserts that she "provided background information as context for her testimony in regard to the indications of coaching and dishonesty during the cognitive graphic interview." Majority op., ¶ 43. Not only is there no support for this assertion in the trial transcript, even the State did not contend that she testified about any objective signs or behaviors of coaching.
f 108. At oral argument, counsel for the State repeatedly conceded that the proper foundation had not been laid for the social worker's conclusions that she saw no indication of coaching. When the State's counsel was asked what objective indications the expert observed, he responded:
• "I understand that we didn't have the foundation. I concede that. We don't have the foundation. It's not there."
• "If you're asking what is the foundation in this case, there wasn't very much of a foundation."
*215 • "Well this gets back to Justice Abrahamson's question about whether there was this foundation here and I'd have to say that I don't know, the record doesn't tell us."
f 109. Rather than determine that the expert impermissibly opined that the witness showed no indications of coaching, the majority over-reaches by sua sponte attempting to lay the foundation for the testimony. Indeed, the majority tells the reader everything the expert should have told the jury, but did not.
¶ 110. Relying on a journal article, the majority informs the reader that a child's inability to supply information on her own, the use of adult language, giving vague or inconsistent accounts, and refusing to discuss details of the abuse are all objective indications of coaching or suggestibility. Majority op., ¶¶ 31-32 (citing August Piper, Investigating Child Sex Abuse Allegations: A Guide to Help Legal Professionals Distinguish Valid from Invalid Claims, 36 J. Psychiatry & L. 271, 302-03 (2008)).
¶ 111. Given its lengthy recitation of the indications of coaching an expert might identify during a cognitive graphic interview, the majority opinion might lead the reader to believe that the expert discussed these indications during her trial testimony. She did not. Although the majority's discussion may be informative, it does not remedy the fact that none of the objective signs or behaviors of coaching was presented to the jury.
¶ 112. Without the necessary foundation, the social worker's testimony does not assist the jury in making a credibility determination—it instead makes that determination for the jury. All that the jury was told is that the expert concluded that she saw no *216 indications of coaching. This contravenes Haseltine's prohibition because it does not fall within the limited exception allowing for objective signs of coaching under Krueger.
¶ 113. The Krueger court provided specific guidance, carefully circumscribing the bounds of permissible testimony. It cautioned that "testimony regarding coaching may more readily border on truthfulness, as compared to the analysis of reactive behavior." 314 Wis. 2d 605, ¶ 15 n.10; see also id., ¶ 21 (Brown, C.J., concurring). Unfortunately, the majority heeded neither the caution nor the bounds of permissible testimony. Accordingly, the coaching testimony here is inadmissible because without the necessary foundational testimony, it violates the Haseltine rule.
III
¶ 114. Because I conclude that the social worker's testimony impermissibly vouched for the credibility of the witness, I address next whether Maday received ineffective assistance of counsel when his trial counsel failed to object to the expert testimony.
¶ 115. Maday must demonstrate that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense in order to prevail on a claim of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687 (1984). To show prejudice, a defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
¶ 116. Several Wisconsin cases have addressed whether the admission of impermissible Haseltine tes *217 timony is prejudicial pursuant to Strickland when a defendant's trial is a pure credibility contest. See, e.g., Haseltine, 120 Wis. 2d at 96; Krueger, 314 Wis. 2d 605, ¶¶ 17-19. All have concluded that such testimony is prejudicial because it undermines confidence in the reliability of the outcome of the trial. See, e.g., Krueger, 314 Wis. 2d 605, ¶ 20; Haseltine, 120 Wis. 2d at 96.
¶ 117. Of particular import, the Krueger court concluded that whether the victim's account of a sexual assault is corroborated by independent evidence is significant in determining performance and prejudice. 314 Wis. 2d 605, ¶ 18. Krueger explained that because the issue at trial was one of credibility, the expert's opinion, "with its aura of scientific reliability, creates too great a possibility that the jury abdicated its fact-finding role to the psychiatrist and did not independently decide [the defendant's] guilt." Id. (quoting Haseltine, 120 Wis. 2d at 96).
¶ 118. The court in Krueger concluded that the risk of prejudice was too great in a one-on-one credibility battle: "[t]here is a significant possibility that the jurors . . . simply deferred to witnesses with experience in evaluating the truthfulness of victims of crime."). Id., ¶ 18 (citing Romero, 147 Wis. 2d at 279). This "possibility gives rise to the reasonable probability that, but for trial counsel's error, the jury would have had a reasonable doubt respecting guilt." Id. (citing Strickland, 466 U.S. at 695).
¶ 119. Here, there was no physical or DNA evidence introduced at trial so the main issue was whether the child or Maday was more credible. This scenario, as discussed above, enhances the risk of prejudice. To tip the balance, Maday offered inconsistencies between the child witness's testimony in the videotaped interview and her testimony at trial. How *218 ever, such evidence pales in comparison to the potency of an "expert" vouching for the credibility of the child.
¶[ 120. The prosecutor's closing argument further amplified the improper influence of the expert's testimony by emphasizing that the expert did not observe indications that the victim "was lying":
You [] got to hear from a social worker who was specially trained to conduct these interviews. She told you there was nothing that she saw that indicated that [the witness] had been coached or that she was lying. Neither of those things were present during her interview with [the witness].
In fact, one of the purposes of that specific interview technique that she uses is to remind the child there are consequences for lying. ... [A]nd again, there was nothing to indicate that [the witness] was making anything up. That's called reliability, and it makes [the witness’s] account more credible.
This testimony that the witness was not lying or making anything up "clouded the crucial issue of credibility." Romero, 147 Wis. 2d at 267.
¶ 121. Thus, similar to Krueger, there is too great of a risk that the jury abdicated its fact-finding role to the expert witness. Contrary to the majority's assertion, a standard instruction advising the jury that it is to be the sole judge of credibility is insufficient to cure the problem. This standard instruction was likely given in every case where an expert's testimony was deemed impermissible under Haseltine and prejudicial under Strickland.
¶ 122. The risk that the jury abdicated its fact-finding role to the expert gives rise to the reasonable probability that, but for trial counsel's error, the jury would have had a reasonable doubt regarding Maday's *219 guilt. Because counsel's error is sufficient to undermine confidence in the outcome of the proceeding, I determine that Maday was prejudiced. See Krueger, 314 Wis. 2d 605, ¶ 18 (citing Strickland, 466 U.S. at 694).
¶ 123. In sum, I conclude that the social worker's expert testimony impermissibly vouched for the credibility of the child witness. The testimony that she saw no indications of dishonesty simply crosses the line drawn by Haseltine. Although the testimony addressing indications of coaching may fall within a Haseltine exception if the proper factual foundation is established, no such foundation exists in this record.
¶ 124. I further conclude that Maday's trial counsel was ineffective by failing to object to this testimony. Thus, I would affirm the court of appeals opinion reversing a circuit court order denying Mad-ay's motion for postconviction relief. Accordingly, I respectfully dissent.
¶ 125. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 At the outset of this dissent I observe that we are reviewing an unpublished per curium opinion of the court of appeals. In accepting review of such opinions, this court runs the risk of unwittingly changing or developing the law in unintended ways. Such appears to be the case here.
Without citing to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), the majority opinion decides that the social worker in this case is a qualified expert witness based on the forensic interview technique she used in eliciting testimony from the child witness. According to the majority, the forensic interview techniques used today are accepted by experts and courts to reliably test the accuracy of a child's allegations of sexual assault. See, e.g., majority op., ¶¶ 28, 29, 49, 50.
However, no case cited by the majority in its lengthy opinion has even addressed, much less recognized as reliable, the "cognitive graphic interview" technique. The only time that the "cognitive graphic interview" technique appears in Wisconsin jurisprudence is over 14 years ago in a case where the conviction was reversed because the circuit court precluded the defense from challenging the reliability of the technique. State v. St. George, 2002 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777.
Undaunted by this reality, the majority sua sponte cloaks this technique with the patina of reliability and asserts that "we must 0 recognize the development of specialized, technical interview methods for investigating allegations of child sexual abuse as well as the case law that gives them life in the courtroom." Majority op., ¶ 49.
What supplemental information does the majority provide to support its assertion that this is a reliable standard? None.
All we know from the social worker's testimony is that in addition to using non-leading questions and a body diagram, the technique consists of the following three component parts: (1) make sure the child understands the difference between truth and lies, and the consequences of a lie; (2) assess the consistency in the child's story; and (3) administer an oath to the child to tell the truth. There is nothing special or scientific about these component parts (As a parent of four children I had several occasions to use this approach, although I usually did not administer an oath.).
*209 Whether a witness qualifies as an expert under the Daubert standard is engendering substantial debate and litigation in this state. However, it is not at issue in this case. Nevertheless, the majority reaches out—without benefit of briefs or oral argument—to analyze and decide whether this witness, employing the "cognitive graphic interview" technique, is a qualified expert witness. In determining that she is, the majority appears to be implicitly deciding that her testimony meets the Daubert standard.