# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP0366-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>            Plaintiff-Respondent-Petitioner, <br>     v. <br> Stanley J. Maday, Jr., <br>            Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 365 Wis. 2d 608, 871 N.W.2d 867
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 5, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Columbia |
| JUDGE: | Andrew W. Voigt |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, R. G., J. concurs (opinion filed). |
| DISSENTED: | BRADLEY, A. W., J. joined by ABRAHAMSON, J. dissents (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner the cause was argued by *Thomas Balistreri*, assistant attorney general, with whom on the brief(s) was *Brad D. Schimel*, attorney general.

For the defendant-appellant, there was a brief and oral argument by *Megan Sanders-Drazen*, assistant state public defender.

**2017 WI 28**

No. 2015AP366-CR
(L.C. No. 2011CF442)

STATE OF WISCONSIN           :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

  **v.**

**Stanley J. Maday, Jr.,**

      **Defendant-Appellant.**

**FILED**

**APR 5, 2017**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 MICHAEL J. GABLEMAN, J. We review an unpublished, per curiam decision of the court of appeals that reversed the Columbia County circuit court's[1] judgment of conviction taken against Stanley J. Maday Jr. ("Maday") and which granted Maday a new trial. State v. Maday, No. 2015AP366-CR, unpublished slip op. (Wis. Ct. App. Oct. 29, 2015).

¶2 On January 15, 2013, following a jury trial, Maday was convicted of three counts of first-degree sexual assault of a

---

[1] The Honorable W. Andrew Voigt presiding.

child.  Maday moved for postconviction relief, arguing that he received ineffective assistance of counsel because:  (1) his counsel failed to object to two questions the prosecutor asked Catherine Gainey ("Gainey"), the social worker who conducted a cognitive graphic interview with the child victim in this case, and (2) his counsel should not have withdrawn an objection to the introduction of evidence about Maday's job-related training in the use of weapons and the use of force.

¶3  We hold that Gainey's testimony about the absence of indications during the cognitive graphic interview, either that K.L. had been coached or that K.L. was being dishonest, does not violate the Haseltine[2] rule, and is therefore admissible.  We so hold for three reasons.  First, Gainey's testimony was limited to her observations of indications of coaching and dishonesty. Second, by limiting her testimony to indications of coaching and dishonesty, Gainey did not provide a subjective opinion as to K.L.'s truthfulness.  Third, testimony, such as Gainey's, may assist the jury.  Accordingly, we conclude that Maday's counsel was not ineffective for failing to object to Gainey's testimony and counsel's performance was therefore not deficient.

¶4  Furthermore, we conclude Maday's counsel was not ineffective for withdrawing his objection to the introduction of evidence of Maday's job-related training in the use of weapons

---

[2] State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) (prohibiting a witness from "giv[ing] an opinion that another mentally and physically competent witness is telling the truth").

2

and the use of force because Maday was not prejudiced by that testimony.

¶5 The decision of the court of appeals is, therefore, reversed.

¶6 We begin our analysis with a brief factual background and procedural history. We then turn to a discussion of forensic interview techniques, the Haseltine rule, and the application of the Haseltine rule to Gainey's testimony in this case. After concluding Gainey's testimony does not violate the Haseltine rule, we address Maday's claim of ineffective assistance of counsel.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶7 In November 2011, the mother of eleven-year-old K.L. found a letter authored by K.L. that described how Maday sexually assaulted K.L. on three occasions. In the letter, K.L. described how, when she slept over at her friend's house, Maday (her friend's father) put his hands in her pants, placed his fingers in her vagina, and slipped his hands under her bra to feel her breasts. After finding this letter, K.L.'s mother reported Maday to the police. Due to the fact that K.L. was eleven years old, the police arranged to have K.L.'s allegations assessed by means of a forensic interview with a social worker. The social worker, Gainey, interviewed K.L. about her allegations. Gainey conducted the interview using a type of forensic interview technique called a cognitive graphic interview.

¶8 For his part, Maday denied K.L.'s allegations, and pled not guilty to three counts of first-degree sexual assault of a child in violation of Wis. Stat. § 948.02(1)(b)[3] and § 948.02(1)(e).[4] The case proceeded to trial by jury.

¶9 The trial began with the prosecutor calling K.L. to the stand. Crying, K.L. read to the jury the letter she wrote to her mother:

> Dear Mom, I'm scared to tell you in person so I wrote this letter. Stan has been sexually harassing me while I'm asleep. I wake up to him either sticking his hand down my shirt and bra or down my pants and underwear. I don't do anything because I'm afraid he will hurt me. He's done this three times now. He did it Friday night. He stuck his hand down my pants and started rubbing there, and then he stuck his finger in my vagina. Then he also stuck his hand down my shirt and my bra, grabbed my boob. I was moving and was moving it around. I know I should have told you the first time this happened, but I was too scared. He's done it three times now, and I want it to stop now if I file papers against him or take him to court. Sincerely, [K.L.]

At trial, K.L. explained the letter she wrote to her mother by further describing the sexual assaults. K.L. testified about one of the assaults: "I remember in the middle of the night that I woke up to Stan touching me and the T.V. being on and [my friend] still being next to me sleeping." She also described

---

[3] "Whoever has sexual intercourse with a person who has not attained the age of 12 years is guilty of a Class B felony." Wis. Stat. § 948.02(1)(b) (2009-10).

[4] "Whoever has sexual contact with a person who has not attained the age of 13 years is guilty of a Class B felony." Wis. Stat. § 948.02(1)(e) (2009-10).

4

how, on another occasion, she awoke on the top bunk in her friend's bedroom to Maday touching her.

¶10 K.L. testified that she did not open her eyes during these assaults until she knew Maday had left the room "[b]ecause I figured if he knew I was awake, he would end up hurting me." Only during the second assault did K.L. say she opened her eyes, but only briefly, lest Maday realize he woke her up. K.L. also described how, on at least one occasion, Maday placed his finger in her vagina.

¶11 During his cross-examination of K.L., Maday's counsel played portions of K.L.'s videotaped cognitive graphic interview with Gainey for the purpose of showing the jury the inconsistencies——the precise number of fingers Maday inserted into her vagina and the exact dates of the assaults——between K.L.'s trial testimony and what K.L. told Gainey during the cognitive graphic interview. K.L. testified that the inconsistencies were the result of her "remembering new things" from being forced to think about what happened to her.

¶12 The State subsequently called K.L.'s mother, and she testified that, when she returned home from work one day, she found the letter that K.L. had written on her bed. She testified that after finding the letter she went to K.L.'s room where she woke up K.L. to talk about the letter. K.L.'s mother testified that "[K.L.] was having a hard time talking" and that "[s]he was crying, shaking, scared," and "hysterical." It was at this point, K.L.'s mother said, that she alerted the police.

5

¶13 As part of the defense's case-in-chief, Maday's counsel called Gainey to testify about the cognitive graphic interview she conducted with K.L. Gainey described the type of forensic interview technique, the cognitive graphic interview, that she uses when interviewing children about their sexual assault allegations and how it is "a rather highly structured interview." She testified that she was "specially trained" in using the cognitive graphic interview "to not conduct leading interviews of children"; that she has conducted about fifty of these types of interviews; and that she has "had experiences in the past where children have been essentially prompted by an adult to give a certain type of answer during this interview" but that, by using the cognitive graphic interview, such prompting "become[s] apparent."

¶14 Gainey also described how a cognitive graphic interview is designed to minimize the risk of false allegations by, among other things, avoiding leading questions and "mak[ing] sure there is consistency between what they are telling [the interviewer] or have told other people." The point, according to Gainey, is to use the cognitive graphic interview to minimize the risk that a child's allegations are a result of coaching by another and to determine if the child fully understands the difference between truth and lies, along with the consequences of lying.

¶15 Gainey testified that, when done correctly, the interviewer in a cognitive graphic interview uses open-ended questions to let the child introduce information into the

6

conversation and express what happened in his or her own words. The interviewer also engages in a "truth-lie" discussion in order to determine if the child adequately understands the difference between the concepts of truth and lies, the importance of telling the truth, and the consequences of lying. At the end of an interview using "the proper interview technique," it "become[s] apparent" if a child has "been essentially prompted by an adult to give a certain type of answer." In short, the cognitive graphic interview technique "is a way to insure that a child who has been coached does not continue with the false allegations."

¶16 As it specifically pertains to the truth-lie discussion she had during her interview with K.L., Gainey testified, "We reviewed what's called the children's oath. It's, you know, do you promise to tell the truth, the whole truth, and nothing but the truth, and the child at that point states typically yes. In this case, [K.L.] did . . . ." Gainey also recounted that "[K.L.] said somebody could get into trouble such as going to jail when asked if there are consequences for when people lie. And then she promised to tell the truth after that."

¶17 After Gainey testified about the cognitive graphic interview technique, her experience with it, and specifics of her interview with K.L., the prosecutor asked Gainey the following questions that are now at issue and that give rise to the first part of Maday's claim of ineffective assistance of counsel:

7

[Prosecutor:] Was there any indication that [K.L.] had been coached in any way during her interview?

[Gainey:] No.

[Prosecutor:] Was there any indication that [K.L.] was not being honest during her interview with you?

[Gainey:] No.

Maday's counsel did not object to these questions, and these questions essentially concluded Gainey's testimony.

¶18 Maday also testified. During his testimony, he read portions of his work records from his job as a sergeant at Columbia Correctional Institution. He did so for the purpose of casting doubt on whether he could have been at home at the times K.L. claimed he assaulted her. On cross-examination, the prosecutor had Maday read specific entries about job-related training sessions he attended for weapons training and use-of-force training. Maday's counsel objected to this line of questioning as irrelevant, but withdrew the objection. The circuit court noted that "whether or not [K.L.] was aware of these specific trainings, I think it is probably true that she was generally aware" that correctional officers receive weapons and use-of-force training. Maday testified that he never demonstrated these techniques for, or used them on, K.L.

¶19 During closing arguments, the prosecutor asked the jury to believe K.L. As part of his argument, the prosecutor referred to Gainey's testimony and reminded the jury that, during the cognitive graphic interview, Gainey did not see any indications that K.L. had been coached or was being dishonest. The prosecutor also commented on Maday's weapons and use-of-

8

force training saying, "He is trained in all those things so [K.L.]'s worry he might do something to her was very real to her. It was very real to her." In an effort to cast doubt on K.L.'s testimony, Maday's counsel replayed portions of K.L.'s cognitive graphic interview with Gainey to highlight the inconsistencies between K.L.'s interview and K.L.'s trial testimony. In particular, he highlighted two inconsistencies: (1) the precise number of fingers Maday placed inside K.L.'s vagina and (2) the exact dates of the sexual assaults.

¶20 After closing arguments, the circuit court instructed the members of the jury, for the second time during Maday's trial, on their role as the sole judges of the credibility of the witnesses. Specifically, the circuit court instructed the jury that "[y]ou are the sole judges of the credibility, that is believability of the witnesses and of the weight to be given to their testimony."

¶21 The jury chose to believe K.L. It found Maday guilty of all three counts, and the circuit court sentenced Maday to 25 years of initial confinement and 8 years of extended supervision on the first count, 15 years of initial confinement and 8 years of extended supervision on the second count, and 15 years of initial confinement and 8 years of extended supervision on the third count.

¶22 On October 23, 2014, Maday filed a motion for postconviction relief. In his motion, Maday argued he received ineffective assistance of counsel, which required the circuit court to grant him a new trial. Maday claimed his counsel was

9

ineffective (1) for failing to object to Gainey's testimony that she observed no indications of coaching or dishonesty during K.L.'s cognitive graphic interview and (2) for withdrawing the objection to the introduction of evidence of Maday's job-related weapons and use-of-force training. The circuit court denied Maday's motion. In denying Maday's motion, the circuit court noted that Gainey's testimony "is about as close as I can personally envision to the line of what is permissible versus impermissible." But, it found Gainey's testimony about the absence of any indications of coaching and dishonesty during the cognitive graphic interview admissible because it "dealt specifically with the videotaped interview." Therefore, there was no deficient performance. The circuit court also noted that the evidence of Maday's job-related training in weapons and use of force was irrelevant but that the evidence was not prejudicial because it is likely commonly assumed that correctional officers have this type of training. Thus, the circuit court found no ineffective assistance of counsel. Maday appealed.

¶23 The court of appeals reversed the circuit court. Maday, unpublished slip op., ¶21. It determined that Gainey's testimony violated the Haseltine rule in that her testimony vouched for K.L.'s credibility, and that Maday's counsel was ineffective for failing to object. Id., ¶¶19-20.

¶24 The court of appeals did not address whether Maday's counsel was ineffective for withdrawing his objection to the evidence of Maday's job-related weapons and use-of-force

10

training because Maday's first argument for ineffective assistance of counsel resolved the case. Id., ¶20 n.3.

## II. STANDARD OF REVIEW

¶25 Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact. State v. Erickson, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). "We will not disturb the circuit court's findings of fact unless they are clearly erroneous." Id. "[T]he circumstances of the case and the counsel's conduct and strategy" are considered findings of fact. State v. Jenkins, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786. Whether counsel's performance was ineffective is a question of law that we review independently. Erickson, 227 Wis. 2d at 768.

## III. DISCUSSION

¶26 In order to assess Maday's claim of ineffective assistance of counsel, we first address whether Gainey's testimony about her observations of indications of coaching and dishonesty made during K.L.'s cognitive graphic interview violates the Haseltine rule. To answer this question, we begin with an explanation of forensic interview techniques and the Haseltine rule. We then address the admissibility of Gainey's testimony. Second, we address Maday's claim for ineffective assistance of counsel.

### A. Forensic Interview Techniques

¶27 Starting with a series of high-profile child sexual assault cases in the 1980s, the interview techniques used with the children during the investigation of some of these cases

11

raised concerns that children were making false allegations of abuse. See, e.g., McMartin v. Children's Inst. Int'l, 261 Cal. Rptr. 437 (Ct. App. 1989); State v. Michaels, 642 A.2d 1372 (N.J. 1994); see also Sena Garven et al., More than Suggestion: The Effect of Interviewing Techniques from the McMartin Preschool Case, 83 J. Applied Psychol. 347 (1998). Indeed, a large number of what turned out to be false allegations caused the public to perceive children as less-than-credible witnesses because of their vulnerability to suggestion and coaching. See Michaels, 642 A.2d at 1376 ("[O]ur common experience tells us that children generate special concerns because of their vulnerability, immaturity, and impressionability . . . ."). Research on detecting false allegations from children following in the wake of these cases led to a marked improvement in the quality of forensic interview techniques used in child sexual assault investigations, allowing forensic interviewers to better meet the unique situations present in these instances. See Garven et al., supra.

¶28 The forensic interview techniques used today are accepted among experts and courts as effective tools for investigating child sexual assault allegations because these methods minimize the risk of false allegations of abuse that result from a child's vulnerability to suggestion and coaching. See Karen J. Saywitz & Lorinda B. Camparo, Contemporary Child Forensic Interviewing: Evolving Consensus and Innovation over 25 Years, in Children as Victims, Witnesses, and Offenders: Psychological Science and the Law 102, 105-06 (Bette L. Bottoms

12

et al. eds., 2009); see also State v. Michael H., 970 A.2d 113, 120 (Conn. 2009) ("In order to discover child abuse, investigators often rely on forensic interviews . . . ."). Indeed, allegations made by children present such a unique circumstance that forensic interview techniques are useful, even necessary, to combat the problems that arise with allegations of abuse made by children. Cf. Michaels, 642 A.2d at 1377 ("That an investigatory interview of a young child can be coercive or suggestive and thus shape the child's responses is generally accepted. If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events.").

¶29 The forensic interview techniques used today, including the cognitive graphic interview technique Gainey used in this case, are designed to address the reliability problems that arise with allegations of abuse made by children and to avoid the problems caused by the interview techniques used previously. See Saywitz & Camparo, supra, at 103. There are a variety of types of forensic interview techniques used to accomplish these results. For example, the court of appeals dealt with the "Step Wise" method, State v. Krueger, 2008 WI App 162, ¶5, 314 Wis. 2d 605, 762 N.W.2d 114, and the Supreme Court of South Carolina dealt with the "Rapport, Anatomy, Touch, Abuse Scenario, and Closure" method, State v. Kromah, 737 S.E.2d 490, 499 (S.C. 2013). Here, though, Gainey used a type of forensic interview called the "cognitive graphic interview." See Saywitz

13

& Camparo, supra, at 109-10 (providing a brief description of the cognitive graphic interview technique).

¶30 These different types of forensic interview techniques are marked by some common characteristics. Id. at 105-06. First, forensic interview techniques use open-ended questions and avoid leading questions in an effort to allow the child to tell the story in his or her own words. See State v. Hilton, 764 So. 2d 1027, ¶20 (La. Ct. App. 2000), cert. denied, 786 So. 2d 113 (La. 2001). Second, forensic interview techniques employ truth-lie discussions wherein the interviewer evaluates the child's understanding of truth and lies and the child's understanding of the consequences for telling lies. See State v. Douglas, 671 S.E.2d 606, 607 (S.C. 2009).

¶31 The interviewer trained in a forensic interview technique looks for indications that a child has been coached to make the allegations of abuse or indications that the child is being dishonest in making the allegations of abuse. See State v. Wembley, 712 N.W.2d 783, 790-91 (Minn. Ct. App. 2006), aff'd, 728 N.W.2d 243 (Minn. 2007). For example, a trained forensic interviewer looks at what information the child introduces into the conversation in response to questioning and looks for a child to communicate this information using a vocabulary and understanding consistent with the child's age. See August Piper, Investigating Child Sex Abuse Allegations: A Guide to Help Legal Professionals Distinguish Valid from Invalid Claims, 36 J. Psychiatry & L. 271, 302-03 (2008). The less information a child can produce on his or her own, the more likely a

14

forensic interviewer will take this as an indication that the allegations of abuse are false. The same holds true for how the child communicates that information. Id. at 308. In other words, a forensic interviewer evaluates whether a child's recollection of abuse is "told from a child's viewpoint, and [whether] sexual knowledge in the child's statements or behavior . . . is beyond that expected for the child's developmental stage." Id. The more "adult" the child's language, the more likely a forensic interviewer will consider the language to be an indication that the allegations of abuse are false.

¶32 As another example, an expert trained in forensic interviewing remains alert for consistency with "explicit details." Id. at 307. "[A] vague or inconsistent account, delivered evasively or using the same rote phrases, detracts from the child's credibility." Id. "[A] child's refusal to discuss details of the abuse should alert the interviewer to the possibility of a fabricated allegation." Id.

¶33 These indications are often observable only within the context of a forensic interview and only to a trained interviewer and thus, taken as a whole, fall outside the realm of common knowledge. E.g., Williams v. State, 970 So. 2d 727, ¶¶24-27 (Miss. Ct. App. 2007) (admitting a forensic interviewer as an expert because her training in forensic interviewing gave her specialized knowledge). Accordingly, a jury could benefit from an expert's assistance when interpreting and identifying the indications bearing on the independence of a child's

15

allegations of abuse when such situations arise. <u>See</u> Wis. Stat. § 907.02 (2013-14).

## B. The <u>Haseltine</u> Rule

¶34 "Under Wisconsin law, a witness may not testify 'that another mentally and physically competent witness is telling the truth.'" <u>State v. Jensen</u>, 147 Wis. 2d 240, 249, 432 N.W.2d 913 (1988) (quoting <u>State v. Haseltine</u>, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984)). Often called the "<u>Haseltine</u> rule," this principle is rooted in the rules of evidence that say "expert testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" <u>State v. Pittman</u>, 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993) (quoting Wis. Stat. § 907.02). "Expert testimony does not assist the fact-finder if it conveys to the jury the expert's own beliefs as to the veracity of another witness." <u>Id.</u> The jury is the sole judge of credibility of the witnesses, and a witness who comments on the veracity of another witness usurps this role instead of assisting the jury in fulfilling it. <u>State v. Romero</u>, 147 Wis. 2d 264, 278, 432 N.W.2d 899 (1988).

¶35 Accordingly, in <u>State v. Krueger</u>, the court of appeals recognized that expert testimony from a social worker about her observations made during a forensic interview "on typical signs of whether a child has been coached or evidences suggestibility and whether the complainant child exhibits such signs" was admissible. <u>Krueger</u>, 314 Wis. 2d 605, ¶14. This was so because it would assist the jury to assess the credibility of the child's allegations of sexual assault. <u>Id.</u>, ¶¶14-15. The

16

social worker's testimony in Krueger was ultimately found inadmissible, though, because it went a step too far in that the social worker testified that she did not believe the child could maintain her story "unless it was something that she had experienced." Id., ¶15. This had the effect of the social worker providing her opinion as to the truth of the child's allegations. Id., ¶16. Thus, the social worker's testimony went beyond that of observations of indications of coaching and deceit she made during her forensic interview with the child and, rather, provided a subjective opinion that had the effect of stating that the child was truthful. Id., ¶14. Her testimony violated the Haseltine rule because it usurped the jury's role as sole judge of credibility of the witness as opposed to merely assisting the jury in that role. It is fairly said, then, that while observations of indications of coaching and deceit the interviewers make during the course of forensic interviews may be received into evidence, statements of subjective opinion about the child's truthfulness are not to be received.

¶36 Other jurisdictions, with a rule similar to our Haseltine rule, have allowed an expert such as Gainey to testify about observations made during the course of a forensic interview. E.g., Wembley, 712 N.W.2d at 790-92; Williams, 970 So. 2d 727, ¶¶15-17; State v. Champagne, 305 P.3d 61, ¶¶33-36 (Mont. 2013). For example, in State v. Kromah, the Supreme Court of South Carolina determined that those who are so trained may testify as to "any personal observations regarding the

17

child's behavior or demeanor" during the forensic interview. Kromah, 737 S.E.2d at 500. An opinion from a forensic interviewer, though, may not include the expression of the expert's belief that the child was being truthful. Id.

C. The Admissibility of Gainey's Testimony Regarding Indications of Coaching and Dishonesty

¶37 We turn now to the application of the foregoing principles to the particular testimony at issue in this case in order to determine whether Gainey's testimony about "indications" of coaching and "indications" of dishonesty during the cognitive graphic interview violated the Haseltine rule.

1. Gainey's Testimony Was Limited to Indications of Coaching and Dishonesty and Did Not Provide a Subjective Opinion Regarding K.L.'s Truthfulness

¶38 As the circuit court found, and as the record bears out, Gainey's testimony was limited only to observations of the indications of coaching and dishonesty she made during the cognitive graphic interview she conducted with K.L. The prosecutor first asked, "Was there any indication that [K.L.] had been coached in any way during her interview?" (Emphasis added). The prosecutor then asked, "Was there any indication that [K.L.] was not being honest during her interview with you?" (Emphasis added). Importantly, both questions are limited to indications. Neither question asked Gainey about her opinion or belief. By limiting it to her observations of indications during the cognitive graphic interview, Gainey's testimony in response to these questions did not provide an opinion about the

18

truth of K.L.'s allegations. Rather, Gainey provided an opinion about indications she is trained to observe during a cognitive graphic interview, an interview technique developed specially for dealing with allegations of abuse made by children. As such, Gainey was not "allowed to convey to the jury . . . her own beliefs as to the veracity of the complainant with respect to the assault," Jensen, 147 Wis. 2d at 256-57.

¶39 Unlike the social worker in Krueger, Gainey did not take that extra step that turned her testimony into a subjective opinion about K.L.'s veracity, and thus into a violation of the Haseltine rule. The State posed the following question in Krueger, "Based upon that, did you form an opinion as to whether or not [S.B.] was the product of any suggestibility or any coaching?" Krueger, 314 Wis. 2d 605, ¶5 (alteration in original). The social worker answered:

> I did not get a sense from this child that she demonstrated a level of sophistication that [she] would be able to maintain some sort of fabricated story, for lack of a better way of describing it. She did not appear to me to be highly sophisticated so that she could maintain that kind of consistency throughout <u>unless it was something that she had experienced</u>.

Id. (emphasis added). The exchange between the prosecutor and Gainey in this case is considerably different. The prosecutor did not ask Gainey for an opinion of whether K.L.'s testimony "was the product" of suggestibility or coaching but, rather, asked Gainey about observable indications of coaching or dishonesty. Further, Gainey did not testify that K.L. could

19

only maintain the consistency of her allegations "unless it was something that [K.L.] had experienced." Rather, Gainey provided testimony grounded in her training as a forensic interviewer by limiting her testimony to the indications she is trained to look for and, by testifying to a lack of any indications of coaching or dishonesty, Gainey avoided giving an opinion as to whether K.L.'s allegations were, in fact, true.

### 2. Gainey's Testimony May Assist the Jury

¶40 Gainey's testimony may have assisted the jury in assessing the credibility of K.L.'s allegations and did not usurp the jury's role as the sole judge of credibility of the witness. The indications a forensic interviewer, like Gainey, is trained to look for often fall outside the realm of common knowledge. See, e.g., Jensen, 147 Wis. 2d at 250-52 (allowing expert testimony about the typical behavior of child sexual assault victims); Krueger, 314 Wis. 2d 605, ¶9 (examining expert testimony regarding signs of coaching). Forensic interviewers are required to complete training in using such interview techniques, and given the unique circumstances present with assessing allegations of abuse made by children, it is, at a minimum, possible that the jury could benefit from the testimony of a forensic interviewer to help them more accurately assess the credibility of a child's allegations. See Jensen, 147 Wis. 2d at 256 ("While an expert's description of the behavior of victims of crime may assist the jury to understand the evidence in the case or to determine a fact in issue, an expert may be no more qualified to compare behavior patterns than the

jury. The jury may be able to draw the requisite inferences itself without the assistance of an expert."). Accordingly, it is at least possible that Gainey, as a trained forensic interviewer, was able to assist, as opposed to usurp, the jury in its role as the sole judge of credibility of the witnesses. As the reasoning of Jensen makes clear, and as we recognize, juries are free either to make use of such testimony or disregard it and rely solely on their own collective wisdom and experience, in accord with the instructions provided to them by the circuit court. See id.

¶41 Based on the foregoing, we conclude Gainey's testimony is admissible.

### D. Maday's Arguments Against Admission

#### 1. The Question About Indications of Coaching

¶42 Maday first argues that, even if testimony about indications of coaching is sometimes admissible, it is admissible only if it includes sufficient detail about what indications the interviewer is looking for because only then is the jury able to draw its own conclusions about the child's allegations. See id. at 255-56. Because these details were not provided here, Maday argues Gainey's testimony violates the Haseltine rule. Maday argues in his brief, "Untethered to background information about the typical signs of coaching, an expert's statement that a child displays no such signs does little to assist the jury and runs an unacceptable 'risk that the jury could interpret the testimony as an opinion that the

21

complainant is being truthful about the assault,'" <u>Jensen</u>, 147 Wis. 2d at 256.

¶43 Gainey provided background information as context for her testimony in regard to the indications of coaching and dishonesty during the cognitive graphic interview. On direct examination, defense counsel introduced the concept of a cognitive graphic interview by asking Gainey, "And that's a rather highly structured interview, isn't it?" Gainey responded, "Yes." Defense counsel asked next, "Why do you go through that kind of structure . . . when interviewing a child?" Gainey answered, "I'm specialized, specially trained in that technique to not conduct leading interviews of children. We also videotape and do that format of an interview so the video can be introduced rather than having the child testify at every hearing."

¶44 On cross-examination, the prosecutor expanded on defense counsel's questioning and asked Gainey about the cognitive graphic interview technique that she uses to conduct forensic interviews:

> Q. Can you explain more fully the benefits of conducting the cognitive graphic type interviews with children?
>
> A. The benefit most importantly is to have that interview done on video so in a matter where the case is taken to the criminal level, the video can be submitted versus having the child appear and testify at multiple hearings.
>
> Q. But the interviewing technique you have been trained on?

22

A.   Oh, I'm sorry.  The technique is to make sure the child fully understands the difference between truth and lies so they understand if they are making up allegations, there are consequences for those lies.  Also to make sure that there is consistency between what they are telling me or have told other people.  I'm not sure if there is anything else I'm missing from your question.

Q.   No.  I think that's fully answered my question. We did not watch the whole video.  We just watched the sort of midsection when you were actually discussing the allegations that she had made.  So at the beginning part of the video that we didn't see, you cover the difference between truth and lie?

A.   Yes.

Q.   And was [K.L.] actually placed under oath?

A.   She was.  We reviewed what's called the children's oath.  It's, you know, do you promise to tell the truth, the whole truth, and nothing but the truth, and the child at that point states typically yes.  In this case she did, and then we have them sign their name to the document as well.

Q.   Did in this instance you also cover consequences for not telling the truth?

A.   Correct.  And I believe with this interview she said somebody could get into trouble such as going to jail when asked if there [are] consequences for when people lie.  And then she promised to tell the truth after that.

Q.   How long have you been conducting these kinds of interviews?

A.   I would say [I] probably was trained at least, well, probably going on three years.

¶45 Gainey also described how she avoids leading questions because she wants the child to introduce information into the conversation:

23

Well, for example, where did your dad touch you. Okay, so you are indicating that, as the interviewer, I know that this man even though you haven't identified him [as] the person that touched you, they did touch you. If the child has not offered that information, you don't introduce that information.

Gainey also described how she uses cognitive graphic interview techniques to "kind of open the door for children to talk about if something has happened to them" by using body diagrams:

We show them a body diagram. We go over the different body parts, have them use the words that they prefer to describe the different body parts. Then we ask them has anybody or do you know what parts on your body are okay or not okay for other people to touch. Then have them identify those body parts, and then we simply ask has anybody touched you anywhere on your body. They can indicate yes or no or where those things happened.

¶46 After describing how she avoids leading questions and uses body diagrams, Gainey further testified:

Q. And you conduct the interview that way because it makes the answers more reliable?

A. Yes.

Q. Have you had experiences in the past where children have been essentially prompted by an adult to give a certain type of answer during this interview?

A. Yes.

Q. And does that become apparent when you use the proper interview techniques?

A. Yes.

Q. So using these interview techniques is a way to insure that a child who has been coached does not continue with the false allegations during the interview?

24

A. Yes.

¶47 In light of the testimony described above, we conclude Gainey did provide a sufficient contextual basis to testify about the indications she observed or, more to the point, did not observe during the course of her cognitive graphic interview with K.L. Jensen requires Gainey to provide sufficient detail about what she is trained to look for, see Jensen, 147 Wis. 2d at 255, and Gainey did so. Gainey discussed the truth-lie discussion she engaged in. She described the open-ended questions she used, and she described how she tried to have K.L. describe the assaults in K.L.'s own words.

2. The Question About Indications of Dishonesty

¶48 Second, Maday argues that even if Gainey is allowed to testify about indications of coaching, Gainey should never have been allowed to testify about indications that K.L. "was not being honest."

¶49 Viewed in isolation, a question about indications of whether a witness was "being honest" would seem to go more directly to truthfulness than a question about indications of coaching. Here, though, we are not viewing Gainey's testimony in isolation, but rather, we view it in the context of a cognitive graphic interview. Gainey was not asked to, and in fact did not, opine about the veracity of another witness's testimony. Rather, Gainey was asked about her observations of indications of dishonesty during a cognitive graphic interview. We honor the principle that a jury normally needs no help assessing whether a witness is telling the truth. However, we

must also recognize the development of specialized, technical interview methods for investigating allegations of child sexual abuse as well as the case law that gives them life in the courtroom. See, e.g., Tenn. Code Ann. § 24-7-123 (Supp. 2016) (allowing the use of a videotaped forensic interview as evidence if certain conditions are met); Michael H., 970 A.2d at 116 (using a forensic interview to investigate allegations of child sexual abuse); Hilton, 764 So. 2d 1027, ¶20 (using a forensic interview at the Jefferson Parish Children's Advocacy Center as part of an investigation into allegations of child sexual abuse); Wembley, 712 N.W.2d at 790-92 (allowing testimony of a forensic interview conducted at CornerHouse in a child sexual abuse case); Champagne, 305 P.3d 61, ¶36 ("The District Court properly allowed Matkin to testify about a matter to which she had training and experience: whether a victim had been coached."); Kromah, 737 S.E.2d 490 (outlining the parameters for admitting testimony of a forensic interview called the "Rapport, Anatomy, Touch, Abuse Scenario, and Closure" method); Douglas, 671 S.E.2d 606 (evaluating testimony from a forensic interviewer in a case involving child sexual abuse); Krueger, 314 Wis. 2d 605 (using a forensic interview called the "Step Wise" method to investigate allegations of child sexual abuse); see also Victor I. Vieth, The Forensic Interviewer at Trial: Guidelines for the Admission and Scope of Expert Witness Testimony Concerning an Investigative Interview in a Case of Child Abuse, 36 Wm. Mitchell L. Rev. 186 (2009).

26

¶50 Any concerns we may have that Gainey was commenting on K.L.'s veracity were addressed during Gainey's testimony in that Gainey was clear that a cognitive graphic interview helps only to increase the reliability of allegations from children. When the prosecutor asked, "And you conduct the interview that way because it makes the answers more reliable," Gainey answered, "Yes." Of at least equal importance, Gainey also answered, "True," in response to defense counsel's question asking, "There is no way for you when conducting an interview to decide to know whether or not previous interviews or questioning has influenced the child's memory." Gainey never implied, much less said, that K.L. was telling the truth. Rather, her testimony was expressly limited both as to scope (the cognitive graphic interview) as well as to the fact that, based upon her training and experience, she did not see any indications of dishonesty, all of which the jury was free to either use for assistance or disregard entirely.

¶51 Therefore, Gainey's testimony does not violate the Haseltine rule because her testimony was limited to commenting on observations of indications she made during her cognitive graphic interview with K.L. and her testimony included the foundation of her training and experience.

E. The Circuit Court's Instructions

¶52 The circuit court instructed the jury on two occasions that it, the jury, was the sole judge of credibility of the witnesses. We generally assume that the jury follows its instructions. E.g., State v. Anthony, 2015 WI 20, ¶89, 361

27

Wis. 2d 116, 860 N.W.2d 10. With no reason to set this assumption aside, we assume here that the jury fulfilled its role as the sole judge of credibility and determined the credibility of K.L.'s testimony for itself. While Gainey's testimony is admissible, the circuit court's proper instruction of the jury helps us in reaching our conclusion because it provides additional assurance that Gainey did not usurp the jury's role as the sole judge of credibility of the witnesses.

F. Maday's Claim of Ineffective Assistance of Counsel

¶53 Maday claims his counsel was ineffective for failing to object to Gainey's testimony and for withdrawing an objection to the introduction of evidence of Maday's job-related training in weapons and use of force. We address each claim in turn, and ultimately, we conclude that neither claim results in ineffective assistance of counsel.

1. The Strickland Test

¶54 Under the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Wisconsin Constitution, a criminal defendant has the constitutional right "to the effective assistance of counsel," Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). Thus, a criminal defendant is denied his constitutional rights when he or she receives ineffective assistance of counsel. The test to determine ineffective assistance of counsel is a two-prong test commonly known as the "Strickland test." Erickson, 227 Wis. 2d at 768. Under the first prong, the defendant must show

28

that counsel's performance was deficient. Id. Here, the question for the court is whether counsel's performance fell below an objective standard of reasonableness. State v. Thiel, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. Under the second prong, the defendant must show that he was prejudiced by counsel's deficient performance. Erickson, 227 Wis. 2d at 768. Here, the question for the court is whether the deficient performance undermines confidence in the outcome. Id. (quoting Strickland, 466 U.S. at 694). Both prongs must be satisfied in order to find ineffective assistance of counsel. Id.

2. Counsel's Failure to Object to Gainey's Testimony Is Not Ineffective Assistance of Counsel

¶55 It follows that Maday's counsel was not deficient for failing to object to Gainey's testimony because we hold that her testimony is admissible. State v. Johnson, 2004 WI 94, ¶24, 273 Wis. 2d 626, 681 N.W.2d 901. Counsel's performance cannot be considered deficient for failing to object to admissible evidence. See State v. Maloney, 2005 WI 74, ¶¶25-30, 281 Wis. 2d 595, 698 N.W.2d 583. Even though the admissibility of Gainey's testimony at the time of the trial may have been unclear, this does not mean counsel was required to object to Gainey's testimony. Id. (discussing that counsel has no duty to object to every possible violation, particularly when the state of the law is unsettled or unclear). In fact, it is axiomatic that "[c]ounsel is not required to object and argue a point of law that is unsettled." Id., ¶28 (quoting State v. McMahon, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994)).

29

¶56 In sum, Maday did not receive ineffective assistance of counsel because counsel's performance was not deficient. There is no need to analyze prejudice because his claim for ineffective assistance of counsel cannot satisfy both prongs. Id., ¶14 ("We need not address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 3. Counsel's Withdrawn Objection to the Training Evidence Is Not Ineffective Assistance of Counsel

¶57 In addition to claiming ineffective assistance of counsel based on his counsel's failure to object to Gainey's testimony, Maday claims his counsel was ineffective for withdrawing an objection to the introduction of evidence of his job-related training in weapons and use of force. Because neither party disputes that this evidence is irrelevant, we will assume without deciding that counsel's performance was deficient when he withdrew his objection to introduction of the evidence. See State v. Smith, 207 Wis. 2d 258, 274-75, 558 N.W.2d 379 (1997). Thus, the first prong is assumed to be satisfied, and we move to the second prong to look for prejudice.

¶58 When determining if counsel's deficiency undermines confidence in the outcome of the trial and amounts to prejudice, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.

¶59 The totality of the evidence before the jury in this case shows no reason why our confidence in the outcome should be undermined. Before the training evidence even entered the

30

courtroom, K.L. testified that she did not report the sexual assaults earlier because she was afraid of Maday and because she knew he had weapons. Further, the jury's perception of Maday likely did not change by hearing testimony of his training because, as the circuit court noted, it is likely commonly assumed that someone of Maday's position, i.e., a correctional officer, has training in weapons and use of force. Thus, there is no prejudice here, and Maday cannot meet the second prong. We are not persuaded that admitting evidence of Maday's training in weapons and use of force undermines confidence in the outcome given the totality of the evidence before the jury.

¶60 In short, Maday cannot show he received ineffective assistance of counsel. As to his first claim, we conclude there is no deficient performance, and as to his second claim, we conclude there is no prejudice.

### IV. CONCLUSION

¶61 We hold that Gainey's testimony about the absence of indications during the cognitive graphic interview either that K.L. had been coached or that K.L. was being dishonest does not violate the <u>Haseltine</u> rule, and is therefore admissible. We so hold for three reasons. First, Gainey's testimony was limited to her observations of indications of coaching and dishonesty. Second, by limiting her testimony to indications of coaching and dishonesty, Gainey did not provide a subjective opinion as to K.L.'s truthfulness. Third, Gainey's testimony may assist the jury. Accordingly, we conclude that Maday's counsel was not ineffective for failing to object to Gainey's testimony.

31

Counsel's performance was not deficient because Gainey's testimony is admissible.

¶62 Furthermore, we conclude Maday's counsel was not ineffective for withdrawing his objection to the introduction of evidence of Maday's job-related training in the use of weapons and the use of force because Maday was not prejudiced by that testimony.

*By the Court.*—The decision of the court of appeals is reversed.

¶63 REBECCA GRASSL BRADLEY, J. *(concurring).* I join the majority opinion's reversal of the decision of the court of appeals and also join its ineffective assistance analysis in part F. I write separately for two reasons: (1) this case should have been analyzed only under the ineffective assistance test, and (2) the third factor the majority uses to support its Haseltine analysis signals a change in the law where none was intended.

I

¶64 Maday's issues should be reviewed only under an ineffective assistance of counsel analysis because his trial counsel: (1) failed to object when the prosecutor asked Gainey the two questions Maday argues violate Haseltine, and (2) withdrew an objection to the questions on Maday's use of weapons and force training. See State v. Carprue, 2004 WI 111, 274 Wis. 2d 656, ¶¶36-47, 683 N.W.2d 31 ("[A]bsence of any objection warrants that we follow 'the normal procedure in criminal cases,'" which is to address the alleged error "within the rubric of the ineffective assistance of counsel." (quoted and cited sources omitted)); see also Kimmelman v. Morrison, 477 U.S. 365, 374-75 (1986) (in absence of objection, error should be analyzed under ineffective-assistance-of-counsel standards, even when error is of constitutional dimension). The majority analyzed the Haseltine issue on the merits, independently from an ineffective assistance review, and after deciding the merits of the Haseltine issue, proceeded to analyze ineffective assistance. I disagree with this approach for many of the

reasons this court expressed in Carprue. It also unnecessarily lengthens the opinion and may lead to problematic consequences. In particular, this court's use of an altered standard of review in unobjected-to error cases could create a lack of certainty for the bench and bar as to when a case like Maday's will be limited to ineffective assistance review and when an unobjected-to error will be decided on the merits. The majority opinion's independent Haseltine analysis worked here because it concluded there was no Haseltine violation. If the majority opinion concluded Haseltine was violated, what would have been the next step? Under the proper ineffective assistance review, our analysis would proceed to the second prong of the ineffective assistance test.

¶65 Although this court may in limited situations overlook a forfeited or waived issue, see State v. Long, 2009 WI 36, ¶44, 317 Wis. 2d 92, 765 N.W.2d 557 (this court may address a waived issue in certain circumstances); see also Carprue, 274 Wis. 2d 656, ¶¶36-39 (discussing reasons why this court is reluctant to overlook non-objected-to error in criminal cases), the majority does not explain why it did not follow this court's normal procedure of limiting our review to ineffective assistance.

¶66 Our review under the ineffective assistance test requires a defendant to show: (1) deficient performance; and (2) prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Jenkins, 2014 WI 59, 355 Wis. 2d 180, ¶¶35-37, 848 N.W.2d 786. To prove deficient performance, Maday must show

2

specific acts or omissions by trial counsel that are "outside the wide range of professionally competent assistance." See Strickland, 466 U.S. at 690. To prove prejudice, Maday must demonstrate his trial counsel's errors were so serious that he was deprived of a fair trial and a reliable outcome. See id. at 687. To satisfy the Strickland prejudice prong, Maday "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." See id. at 697. We need not address both deficient performance and prejudice if Maday fails to prove either one. See id. at 697. This court's review of ineffective assistance claims presents mixed questions of law and fact: (1) findings of facts will not be disturbed unless clearly erroneous, and (2) the legal conclusions "of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." State v. Johnson, 153 Wis. 2d 121, 127-28, 449 N.W.2d 845 (1990).

¶67 The majority opinion followed our normal procedure in reviewing Maday's weapons-training claim by analyzing that claim only under ineffective assistance. As noted, I join that part of the majority's opinion. My analysis focuses on the alleged ineffective assistance based on a violation of Haseltine. I conclude Maday failed to establish ineffective assistance here because his trial counsel's decision to withhold objections to the two questions asked of Gainey during cross-examination was

3

not outside the wide range of professionally competent assistance and therefore not deficient. This was not deficient performance because, as the majority explains at great length,[1] the answers did not cross the Haseltine line. The Haseltine rule provides: "No witness, expert or otherwise should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984). Asking Gainey whether she saw any indications, during the cognitive graphic interview of K.L., that K.L. had been coached or was not being honest did not elicit a subjective opinion that K.L. was telling the truth or that the sexual assault occurred. Gainey did not convey to the jury that she personally believed K.L.'s testimony or that Maday committed the sexual assaults. Gainey's testimony was limited to her observations that during the cognitive graphic interview, she saw no indications of coaching or suggestion or dishonesty. This testimony does not cross the Haseltine line and is permissible. See State v. Krueger, 2008 WI App 162, ¶14, 314 Wis. 2d 605, 762 N.W.2d 114 (explaining that precedent and logic both support permitting "expert testimony on typical signs of whether a child has been coached or evidences suggestibility and whether the complainant child exhibits such signs"). Because the failure to object was

---

[1] I agree with much of the majority's analysis on the cognitive graphic interview; I also agree with the reasons the majority opinion sets forth in ¶¶39-40 as to why Gainey's testimony did not violate Haseltine. See State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984).

not deficient, it is not necessary to analyze whether the failure to object prejudiced Maday.

II

¶68 My second concern with the majority's Haseltine analysis involves the third factor it uses to support its independent Haseltine analysis: "Third, testimony, such as Gainey's, may assist the jury." Majority op. ¶3; see also majority op. ¶61. I have no doubt this is true. Testimony like Gainey's will assist the jury. However, neither party raised a concern under Wis. Stat. § 907.02[2] or argued the testimony would not assist the jury.

¶69 Maday raised the issue of whether his counsel should have objected on the basis that Gainey's testimony violated Haseltine—not whether Gainey's testimony satisfied Wis. Stat. § 907.02. My concern is that the majority's use of the "assist the jury" factor may suggest to the bench and bar that this court has changed the Haseltine test. We have not. The

---

[2] Wisconsin Stat. § 907.02(1) limits the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

(Emphasis added.)

<u>Haseltine</u> test remains the same. The majority's use of the "assist the jury" factor was not intended as a stand-alone, independent factor. Rather, the majority declares that Gainey's testimony did not violate <u>Haseltine</u> because <u>all</u> <u>three</u> of the factors it lists in ¶¶3 and 61 are present here.[3]

¶70 For these reasons, I respectfully concur.

---

[3] Although this court discussed Wis. Stat. § 907.02 (1985-86) in <u>State v. Jensen</u>, 147 Wis. 2d 240, 432 N.W.2d 913 (1988), it did so in a very different context. The challenged testimony involved a school guidance counselor testifying that the victim's reactive behavior was consistent with victims of sexual abuse. <u>Id.</u> at 248-49. The defense used the reactive behavior to argue the complainant fabricated the sexual assaults. <u>Id.</u> at 251-52. The State used the testimony to counter that defense, suggesting the reactive behavior was caused by sexual assault. <u>Id.</u> at 252. This court held, in that context, "an expert witness may be asked to describe the behavior of the complainant and then to describe that of victims of the same type of crime, if the testimony helps the jury understand a complainant's reactive behavior." <u>Id.</u> at 257. Maday's case does not present the same context.

6

¶71 ANN WALSH BRADLEY, J. *(dissenting).* The State of Wisconsin seeks review of an unpublished per curium decision of the court of appeals that reversed the conviction of Stanley Maday, granting him a new trial. The court of appeals determined that the State violated what heretofore has been a rule in Wisconsin held sacrosanct——under no circumstances may an expert witness opine on whether another witness is being truthful.

¶72 At issue is whether a social worker's expert testimony at trial impermissibly vouched for the credibility of a child witness. Until today, the fundamental premise that the jury is "the lie detector in the courtroom" has properly limited the admissibility of expert testimony regarding a witness's credibility. State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (1984) (citing United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973)).

¶73 However, in this case the majority concludes otherwise. It determines that Haseltine permits a social worker's expert testimony that she saw no indication that the witness was dishonest during her interview. Additionally it puts its imprimatur on testimony that she saw no indication that the witness had been coached to make false allegations. Majority op., ¶3.

¶74 In reaching its conclusion, the majority misconstrues Wisconsin precedent, distorting and expanding the limited exceptions allowing for expert testimony until they swallow the rule. As a result, it allows social science to usurp the jury's

1

role as the lie detector in the courtroom. The majority further errs in reconfiguring the expert's testimony by creating out of whole cloth the necessary foundational facts, which even the State concedes are nonexistent in this record.

¶75 Contrary to the majority, I conclude that the social worker's expert testimony that she saw no indications of dishonesty crossed the line drawn by Haseltine. It impermissibly vouched for the credibility of the child witness.

¶76 Similarly, I determine that the testimony addressing indications of coaching was impermissible. Although our precedent establishes that coaching testimony may fall within a Haseltine exception if the proper factual foundation is established, no such foundation exists in this record.

¶77 Because I further conclude that Maday's trial counsel was ineffective by failing to object to this vouching testimony, I would affirm the court of appeals. Accordingly, I respectfully dissent.

I

¶78 From the outset, the majority misconstrues well-established Wisconsin precedent, distorting and expanding the limited exceptions allowing for expert testimony until they swallow the rule.

¶79 Thus, I begin as the majority should have, with Haseltine's rule that "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." Haseltine, 120 Wis. 2d at 96.

¶80 Because the majority opinion substantially alters the limited exceptions permitting expert testimony, I pause to set those forth here. <u>Haseltine</u> determined that in only limited circumstances will expert testimony aid a jury. <u>Id.</u> at 96-97. For example, the <u>Haseltine</u> court explained that an incest victim may exhibit behaviors, such as not immediately reporting the incest or recanting allegations, which might lead jurors to believe that the victim is not telling the truth. <u>Id.</u> at 97. It reasoned that an expert "could explain that such behavior is common among incest victims as a result of guilt, confusion, and a reluctance to accuse a parent." <u>Id.</u> at 97.

¶81 In <u>State v. Jensen</u>, 147 Wis. 2d 240, 244, 432 N.W.2d 913 (1998), this court permitted a guidance counselor to testify regarding specific changes in the victim's behavior at school, such as acting out in class and noncompliance with homework. After addressing the specific behaviors exhibited by children who had been sexually abused, the guidance counselor testified that the victim's behavior was consistent with the behavior of child sexual abuse victims. <u>Id.</u> at 246-48.

¶82 The <u>Jensen</u> court concluded that the counselor's testimony was permissible because "the expert witness's knowledge and experience might have assisted the jury in this case." <u>Id.</u> at 246. It determined that "the reactions and behavior of sexually abused children are not ordinarily matters of common knowledge and experience and that the jury might therefore be aided by the witness's specialized knowledge in this area." <u>Id.</u>

3

¶83 Thus, Jensen explained that "an expert opinion is useful for disabusing the jury of common misconceptions about the behavior of sexual assault victims." Id. at 251. Jensen was explicit, however, that "the expert witness must not be allowed to convey to the jury his or her own beliefs as to the veracity of the complainant with respect to the assault." Id. at 256-57.

¶84 More recently, in State v. Krueger, the court of appeals permitted "expert testimony on typical signs of whether a child has been coached or evidences suggestibility and whether the complainant child exhibits such signs." 2008 WI App 162, ¶14, 314 Wis. 2d 605, 762 N.W.2d 114. The Krueger court observed that testimony about a child's consistency, coupled with testimony regarding the behavior of like-aged children, could help the jury understand the interview and rebut a defense theory of coaching or suggestion. Id., ¶15. Thus, Krueger explained that "[s]igns of coaching or suggestion could fall into the realm of knowledge that is outside that of a lay-person jury." Id.

¶85 The Krueger court provided specific guidance regarding the bounds of permissible testimony. Appropriate testimony addresses "objective signs or behavior indicative of whether the child's rendition is of the child's own making——whether truthful or not." Id., ¶15 n.10. Krueger further detailed that in addition to patterns of consistency, examples of objective behaviors include the child's ability to supply peripheral details of the alleged incident, the use of language that

4

reflects the word usage of an adult, or the reporting of information not appropriate for the developmental level of the child. Id.

¶86 The majority misconstrues Wisconsin precedent by ignoring that Krueger, and not Jensen, addressed the type of coaching testimony at issue in this case. Krueger makes clear that an expert must testify to objective signs or behaviors of coaching before offering an opinion as to whether a child witness exhibited those signs or behaviors. Id. Yet, this requirement is absent from the majority opinion, which contends that under Jensen an expert's qualifications provide sufficient foundation for her testimony.

¶87 Discussing Jensen, the majority asserts that it simply "requires [the social worker] to provide sufficient detail about what she is trained to look for, . . . and [she] did so." Majority op., ¶47 (citing Jensen, 147 Wis. 2d at 255). In its analysis, the majority quotes at length from the expert's testimony regarding her training and experience in conducting this type of interview. Majority op., ¶¶44-46. Thus, the majority concludes that the social worker "provide[d] a sufficient contextual basis to testify about the indications she observed or, more to the point, did not observe during the course of her cognitive graphic interview with K.L." Majority op., ¶47.

¶88 The majority distorts the Jensen exception because Jensen does not require that an expert testify only about the methods she uses in interviewing a child witness or her training

5

in using these methods before offering a conclusion.  A social worker's interview methods, as well as training in using these methods, certainly pertain to her qualifications as an expert.  However, whether the social worker was properly qualified as an expert witness is not at issue here.[1]  What is in dispute is

---

[1] At the outset of this dissent I observe that we are reviewing an unpublished per curium opinion of the court of appeals.  In accepting review of such opinions, this court runs the risk of unwittingly changing or developing the law in unintended ways.  Such appears to be the case here.

Without citing to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), the majority opinion decides that the social worker in this case is a qualified expert witness based on the forensic interview technique she used in eliciting testimony from the child witness.  According to the majority, the forensic interview techniques used today are accepted by experts and courts to reliably test the accuracy of a child's allegations of sexual assault.  See, e.g., majority op., ¶¶28, 29, 49, 50.

However, no case cited by the majority in its lengthy opinion has even addressed, much less recognized as reliable, the "cognitive graphic interview" technique.  The only time that the "cognitive graphic interview" technique appears in Wisconsin jurisprudence is over 14 years ago in a case where the conviction was reversed because the circuit court precluded the defense from challenging the reliability of the technique.  State v. St. George, 2002 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777.

Undaunted by this reality, the majority sua sponte cloaks this technique with the patina of reliability and asserts that "we must [] recognize the development of specialized, technical interview methods for investigating allegations of child sexual abuse as well as the case law that gives them life in the courtroom."  Majority op., ¶49.

What supplemental information does the majority provide to support its assertion that this is a reliable standard?  None.

(continued)

6

whether the expert's testimony impermissibly vouched for the credibility of the child witness.

¶89 Haseltine, Jensen and Krueger, do not allow a social worker to offer an opinion as to whether a witness showed signs of dishonesty. Instead, our precedent permits an expert to testify about the behaviors of victims of abuse and the objective signs or behaviors of coaching. An expert may offer an opinion regarding whether a witness showed signs of coaching only after providing a foundation by testifying about the objective signs or behaviors of coaching and whether a witness exhibited those signs. Krueger, 314 Wis. 2d 605, ¶15 n.10.

¶90 Under the majority's expansion of the law, every qualified expert could offer a conclusion regarding whether a witness showed signs of dishonesty or coaching provided that she

---

All we know from the social worker's testimony is that in addition to using non-leading questions and a body diagram, the technique consists of the following three component parts: (1) make sure the child understands the difference between truth and lies, and the consequences of a lie; (2) assess the consistency in the child's story; and (3) administer an oath to the child to tell the truth. There is nothing special or scientific about these component parts (As a parent of four children I had several occasions to use this approach, although I usually did not administer an oath.).

Whether a witness qualifies as an expert under the Daubert standard is engendering substantial debate and litigation in this state. However, it is not at issue in this case. Nevertheless, the majority reaches out——without benefit of briefs or oral argument——to analyze and decide whether this witness, employing the "cognitive graphic interview" technique, is a qualified expert witness. In determining that she is, the majority appears to be implicitly deciding that her testimony meets the Daubert standard.

was properly qualified as a witness. The Haseltine rule, which the majority purports to follow, would be swallowed by the exceptions.

II

¶91 I turn next to address whether the testimony in this case is permissible under the Haseltine rule or one of the limited exceptions set forth in Haseltine, Jensen and Krueger. The expert testified that during the interview there was no indication that the witness was dishonest. Additionally, without any foundational testimony regarding the objective signs or behaviors of coaching, the expert confirmed that there was no "indication that [the witness] had been coached in any way during her interview." I address each in turn.

A

¶92 In determining the expert could testify that she saw no indication of dishonesty, the majority violates the essential Haseltine rule and allows purported social science to usurp the jury's role as the lie detector in the courtroom.

¶93 The majority acknowledges that when "[v]iewed in isolation, a question about indications of whether a witness was 'being honest' would seem to go more directly to truthfulness than a question about indications of coaching." Majority op., ¶49. However, the majority excuses this testimony by reasoning that "[h]ere, though, we are not viewing Gainey's testimony in insolation, but rather, we view it in the context of a cognitive graphic interview." Id.

8

¶94 It reasons that "[a]ny concerns we may have that Gainey was commenting on K.L.'s veracity were addressed during Gainey's testimony in that Gainey was clear that a 'cognitive graphic interview' technique helps only to increase the reliability of allegations from children." Id., ¶50. According to the majority, "[t]he forensic interview techniques used today are accepted among experts and courts as effective tools for investigating child sexual assault allegations because these methods minimize the risk of false allegations of abuse that result from a child's vulnerability to suggestion and coaching." Id., ¶28.

¶95 There is no basis for the flexibility the majority finds in the law. Wisconsin precedent is clear and unambiguous that "[u]nder no circumstances may the expert venture an opinion about whether the subject is being truthful or whether the crime occurred." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 608.3, at 489-90 (3rd ed. 2008); see also Haseltine, 120 Wis. 2d at 96; Jensen, 147 Wis. 2d at 256-57; Krueger, 314 Wis. 2d 605, ¶19; State v. Romero, 147 Wis. 2d 264, 278, 432 N.W.2d 899 (1988).

¶96 The law does not place as much faith in interview techniques as does the majority. Social science, as the majority acknowledges, may be deemed reliable today and unreliable in the future. See majority op., ¶27.

¶97 Indeed, experts and commentators agree that "the fields of [mind sciences] have not developed to a point where these practitioners are likely to be better judges of

9

truthfulness than a lay jury." 7 Daniel D. Blinka, <u>Wisconsin Practice Series: Wisconsin Evidence</u> § 608.3, at 485. Consequently, the law of evidence "remains justifiably skeptical of the role of the various mind sciences in assessing credibility, as best seen in the blanket exclusion of polygraph evidence." <u>Id.</u> at 485-86.

¶98 This court has recognized that a psychiatrist has "no specialized ability to assess the truthfulness of [a witness's] account." <u>State v. Kleser</u>, 2010 WI 88, ¶105, 328 Wis. 2d 42, 786 N.W.2d 144 (citing <u>State v. Moran</u>, 728 P.2d 248, 255 (Ariz. 1986) (citing <u>People v. Bledsoe</u>, 681 P.2d 291, 300 (Cal. 1984) ("Psychologists and psychiatrists are not, and do not claim to be, experts at discerning the truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility.")). As <u>Haseltine</u> cautioned, an expert's opinion on truthfulness provides only an "aura of scientific reliability," which must not replace the jury as the lie detector in the courtroom. <u>See</u> 120 Wis. 2d at 95.

¶99 Accordingly, it the proper role of the jury, and not an expert witness, to determine whether a witness is truthful. <u>Id.</u> at 96. The jury in this case had the opportunity to watch the child witness's videotaped testimony and observe her testimony at trial. By concluding that the context of a "cognitive graphic interview" permits an expert to testify about a witness's truthfulness, the majority allows social science to usurp the jury's role as lie detector in the courtroom.

¶100 The majority repeatedly contends, however, that because the expert did not use the word "opinion," and instead said that she saw no "indications" of dishonesty, her testimony will aid the jury. It errs because as this court has explained, the vouching rule does not become "inapplicable simply because a witness does not use specific words such as 'I believe X is telling the truth' . . . " Kleser, 328 Wis. 2d 42, ¶102. Indeed, "[t]here is no requirement that an expert explicitly testify that she believes a person is telling the truth for an expert's opinion to constitute improper vouching testimony." Id.

¶101 A "requirement that specific words be used would permit the rule to be circumvented easily." Id. That is exactly what the majority allows the State to do here, when it determines that the expert's testimony that she saw no indications of dishonesty is admissible.

¶102 Contrary to the majority's assertions, this testimony is not admissible even if it addresses a witness's truthfulness only in the context of a cognitive graphic interview. Haseltine prohibits expert testimony regarding a witness's credibility and therefore prohibits the expert's testimony about whether the witness was being honest during her interview. 120 Wis. 2d at 96. A unanimous court of appeals determined that this testimony clearly crossed the Haseltine line. I agree.

B

¶103 Next I address whether the expert's testimony that she saw no indications that the witness had been coached is

permissible under one of the limited exceptions set forth in Haseltine, Jensen and Krueger. I begin by invoking and paraphrasing the maxim: the majority may be entitled to develop its own opinion, but it is not entitled to develop its own facts. Out of whole cloth, the majority develops its own factual record, which even the State concedes is nonexistent.

¶104 Haseltine and Jensen permit expert testimony about the typical behavior of victims of abuse. Haseltine, 120 Wis. 2d at 97; Jensen, 147 Wis. 2d at 246. The expert's testimony in this case did not address the typical behavior of victims of abuse, such as a delay in reporting or acting out in school. Consequently, I need not further address this limited exception. Instead, the testimony here focused on the interview process. Thus, I examine the limited exception for coaching testimony derived from an interview and permitted under Krueger.

¶105 Krueger reasoned that testimony about whether a child's behavior during an interview is consistent with the behavior of like-aged children could both help a jury understand the interview and rebut a defense theory of coaching. 314 Wis. 2d 605, ¶14. Under Krueger, admissible testimony addresses "objective signs or behavior" such as a child's ability to supply peripheral details of the alleged incident, the use of language that reflects the word usage of an adult, or the reporting of information not appropriate for the developmental level of the child. Id., ¶15 n.10.

¶106 The expert in this case gave none of the foundational testimony that Krueger requires. Without any foundational

testimony regarding the objective signs or behaviors of coaching, the expert witness baldly concluded that there was no indication that the witness had been coached in any way during her interview.

¶107 To fill a void in the record, the majority reconfigures the expert's testimony here. It asserts that she "provided background information as context for her testimony in regard to the indications of coaching and dishonesty during the cognitive graphic interview." Majority op., ¶43. Not only is there no support for this assertion in the trial transcript, even the State did not contend that she testified about any objective signs or behaviors of coaching.

¶108 At oral argument, counsel for the State repeatedly conceded that the proper foundation had not been laid for the social worker's conclusions that she saw no indication of coaching. When the State's counsel was asked what objective indications the expert observed, he responded:

- "I understand that we didn't have the foundation. I concede that. We don't have the foundation. It's not there."
- "If you're asking what is the foundation in this case, there wasn't very much of a foundation."
- "Well this gets back to Justice Abrahamson's question about whether there was this foundation here and I'd have to say that I don't know, the record doesn't tell us."

13

¶109 Rather than determine that the expert impermissibly opined that the witness showed no indications of coaching, the majority over-reaches by sua sponte attempting to lay the foundation for the testimony. Indeed, the majority tells the reader everything the expert should have told the jury, but did not.

¶110 Relying on a journal article, the majority informs the reader that a child's inability to supply information on her own, the use of adult language, giving vague or inconsistent accounts, and refusing to discuss details of the abuse are all objective indications of coaching or suggestibility. Majority op., ¶¶31-32 (citing August Piper, Investigating Child Sex Abuse Allegations: A Guide to Help Legal Professionals Distinguish Valid from Invalid Claims, 36 J. Psychiatry & L. 271, 302-03 (2008)).

¶111 Given its lengthy recitation of the indications of coaching an expert might identify during a cognitive graphic interview, the majority opinion might lead the reader to believe that the expert discussed these indications during her trial testimony. She did not. Although the majority's discussion may be informative, it does not remedy the fact that none of the objective signs or behaviors of coaching was presented to the jury.

¶112 Without the necessary foundation, the social worker's testimony does not assist the jury in making a credibility determination——it instead makes that determination for the jury. All that the jury was told is that the expert concluded that she

14

saw no indications of coaching. This contravenes Haseltine's prohibition because it does not fall within the limited exception allowing for objective signs of coaching under Krueger.

¶113 The Krueger court provided specific guidance, carefully circumscribing the bounds of permissible testimony. It cautioned that "testimony regarding coaching may more readily border on truthfulness, as compared to the analysis of reactive behavior." 314 Wis. 2d 605, ¶15 n.10; see also id., ¶21 (Brown, C.J., concurring). Unfortunately, the majority heeded neither the caution nor the bounds of permissible testimony. Accordingly, the coaching testimony here is inadmissible because without the necessary foundational testimony, it violates the Haseltine rule.

III

¶114 Because I conclude that the social worker's testimony impermissibly vouched for the credibility of the witness, I address next whether Maday received ineffective assistance of counsel when his trial counsel failed to object to the expert testimony.

¶115 Maday must demonstrate that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense in order to prevail on a claim of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687 (1984). To show prejudice, a defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the

15

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

¶116 Several Wisconsin cases have addressed whether the admission of impermissible Haseltine testimony is prejudicial pursuant to Strickland when a defendant's trial is a pure credibility contest. See, e.g., Haseltine, 120 Wis. 2d at 96; Krueger, 314 Wis. 2d 605, ¶¶17-19. All have concluded that such testimony is prejudicial because it undermines confidence in the reliability of the outcome of the trial. See, e.g., Krueger, 314 Wis. 2d 605, ¶20; Haseltine, 120 Wis. 2d at 96.

¶117 Of particular import, the Krueger court concluded that whether the victim's account of a sexual assault is corroborated by independent evidence is significant in determining performance and prejudice. 314 Wis. 2d 605, ¶18. Krueger explained that because the issue at trial was one of credibility, the expert's opinion, "with its aura of scientific reliability, creates too great a possibility that the jury abdicated its fact-finding role to the psychiatrist and did not independently decide [the defendant's] guilt." Id. (quoting Haseltine, 120 Wis. 2d at 96).

¶118 The court in Krueger concluded that the risk of prejudice was too great in a one-on-one credibility battle: "[t]here is a significant possibility that the jurors . . . simply deferred to witnesses with experience in evaluating the truthfulness of victims of crime."). Id., ¶18 (citing Romero, 147 Wis. 2d at 279). This "possibility gives

16

rise to the reasonable probability that, but for trial counsel's error, the jury would have had a reasonable doubt respecting guilt." Id. (citing Strickland, 466 U.S. at 695).

¶119 Here, there was no physical or DNA evidence introduced at trial so the main issue was whether the child or Maday was more credible. This scenario, as discussed above, enhances the risk of prejudice. To tip the balance, Maday offered inconsistencies between the child witness's testimony in the videotaped interview and her testimony at trial. However, such evidence pales in comparison to the potency of an "expert" vouching for the credibility of the child.

¶120 The prosecutor's closing argument further amplified the improper influence of the expert's testimony by emphasizing that the expert did not observe indications that the victim "was lying":

> You [] got to hear from a social worker who was specially trained to conduct these interviews. She told you there was nothing that she saw that indicated that [the witness] had been coached or that she was lying. Neither of those things were present during her interview with [the witness].
>
> In fact, one of the purposes of that specific interview technique that she uses is to remind the child there are consequences for lying. . . . [A]nd again, there was nothing to indicate that [the witness] was making anything up. That's called reliability, and it makes [the witness's] account more credible.

This testimony that the witness was not lying or making anything up "clouded the crucial issue of credibility." Romero, 147 Wis. 2d at 267.

17

¶121 Thus, similar to Krueger, there is too great of a risk that the jury abdicated its fact-finding role to the expert witness. Contrary to the majority's assertion, a standard instruction advising the jury that it is to be the sole judge of credibility is insufficient to cure the problem. This standard instruction was likely given in every case where an expert's testimony was deemed impermissible under Haseltine and prejudicial under Strickland.

¶122 The risk that the jury abdicated its fact-finding role to the expert gives rise to the reasonable probability that, but for trial counsel's error, the jury would have had a reasonable doubt regarding Maday's guilt. Because counsel's error is sufficient to undermine confidence in the outcome of the proceeding, I determine that Maday was prejudiced. See Krueger, 314 Wis. 2d 605, ¶18 (citing Strickland, 466 U.S. at 694).

¶123 In sum, I conclude that the social worker's expert testimony impermissibly vouched for the credibility of the child witness. The testimony that she saw no indications of dishonesty simply crosses the line drawn by Haseltine. Although the testimony addressing indications of coaching may fall within a Haseltine exception if the proper factual foundation is established, no such foundation exists in this record.

¶124 I further conclude that Maday's trial counsel was ineffective by failing to object to this testimony. Thus, I would affirm the court of appeals opinion reversing a circuit court order denying Maday's motion for postconviction relief. Accordingly, I respectfully dissent.

18

¶125 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.